No. 51.—ANTHONY, a slave, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] In prosecutions of slaves under the Act of 1850 : *Held*, not to be necessary to aver the preliminary proceedings before the Magistrates, in the bill of indictment, nor to prove them on the trial.

[2.] The constitutionality of the Act of 1850, authorizing the trial of slaves before the Superior Court, sustained.

[3.] In prosecutions under this Act for murder, and verdict of manslaughter : *Held*, that the Superior Court may pass sentence and inflict the punishment provided by law for manslaughter.

Indictment for murder—conviction for manslaughter, in McIntosh Superior Court. Tried before Judge HENRY R. JACKSON, November Term, 1850.

Anthony, a slave, was indicted in McIntosh Superior Court, for the murder of Ben Cousins, a free man of color. The indictment was framed in the usual form.

The Jury found a verdict of guilty of voluntary manslaughter ; whereupon counsel for plaintiff in error moved, in arrest of judgment, on the following grounds :

1st. Because it being a case of voluntary manslaughter, the Court had no jurisdiction, and could not punish.

2d. Because the preliminary proceedings had before the committing Magistrates, were not set forth in the indictment, so as to show that the Court had jurisdiction of the cause, or to show with what offence the prisoner was charged by the Magistrates.

3d. Because the Act of 1850, under which the trial was had, is unconstitutional and void.

Which motion was overruled, and this decision is alleged to be erroneous.

L. S. DeLYON, for plaintiff in error.

Sol. Gen. GAULDEN, for defendant.

Anthony, a slave, vs. The State of Georgia.

*By the Court.*—NISBET, J. delivering the opinion.

[1.] In this assignment it is charged as error, that the presiding Judge held it unnecessary to set forth, in the bill of indictment against the slave, the opinion, in writing, of the Justices by whom he was committed, that he had committed a capital offence, and the other papers appertaining to the charge against him, and that, on the trial, it was unnecessary to prove them. Under the old law it was necessary, in proceeding against a slave for a capital offence before the *Inferior Court,* to prove the preliminary proceedings before the Magistrates, and for very good reason. The *Inferior Court,* being a Court of limited jurisdiction, its jurisdiction over the offence charged against the slave ought to appear on the record of its action. By the Act of 1811, the *Inferior Court* is directed to try slaves, when, after a hearing before the Magistrates, it is made to appear to them that he is guilty of a capital offence, and they are notified of that fact. The preliminary proceedings before the Magistrates, and their judgment as to the character of the offence, and their notice to the Justices of the Inferior Court, are made to supply the place of indictment and finding thereon by the Grand Jury, or presentment by the Jury and indictment thereon in case of white persons. The Act of 1811 contemplates and provides for no preliminary inquiry before the Grand Jury, by way of presentment or finding on a bill. The *Inferior Court* took jurisdiction upon the proceedings before the committing Magistrates. With great reason, therefore, was it held, that upon the trial these proceedings should be proven. *Judge, a slave, vs. The State of Georgia,* 8 *Geo. Rep.* 173.

Very different stands the case under the Act of 1850. It is true that, by that Act, a preliminary inquiry upon the charge made against a slave, by the Justices of the Peace, may be had; and if after their investigation, they are of opinion that the slave is guilty of a capital offence, they having no jurisdiction of that offence, are required to certify their opinion, in writing, and transmit the same, together with a report in writing of the evi-

dence taken before them on the examination, and all other papers appertaining to the charge against the slave, to the Attorney or Solicitor General, being the prosecuting officer in the *Superior Court* of the County, on the first day of the next term of said Court; but for what purpose ? Not that the *Superior Court* shall, upon their opinion and the other papers and evidence appertaining to the charge thus transmitted, proceed to try the slave, as under the Act of 1811, the Inferior Court would do ; but that being thus notified of a capital offence being charged upon a slave, the Attorney or Solicitor General might frame and send before the Grand Jury a bill of indictment against the slave so charged, as in cases of free white persons. The second section of the Act provides, " that upon receiving the papers in any such case, as provided in the preceding section, it shall be the duty of such Attorney or Solicitor General to frame and send before the Grand Jury a bill of indictment against the person or persons so charged, as in cases of free white persons." And the Act further declares, " and in any case wherein a slave or free person of color shall have been committed, and a return made of the papers to the Attorney or Solicitor General, as provided in the first section of this Act, if there shall be no prosecutor bound or appearing to prosecute the case, it shall be the duty of the Attorney or Solicitor General to place before the Grand Jury such charge, made by such Justices of the Peace, together with all legal testimony sustaining it, which may be accessible to him, and said Grand Jury may, upon such evidence, in their discretion, present such offence to the Court." *Pamphlet* 1849 '50, *p.* 372. From these provisions of the Act of 1850, it is clear that the transmission of these papers to the Attorney or Solicitor General, is merely *directory to him*, and that they constitute no part of the pleadings or proofs before the Superior Court. It is only a form by which the Justices of the Peace are made to disclaim jurisdiction in capital cases, and by which the prosecuting officer is notified that a capital offence has been committed. The papers do not give the jurisdiction to the Superior Court. The Act confers it upon that Court, irrespective of them; for it makes it the duty of the Attorney or Solicitor General, upon receipt of

them, to frame a bill against the slave charged, and send it before the Grand Jury, if there is a prosecutor, and, if none, then to lay them before the Grand Jury, that they may present the offence to the Court, and a bill of indictment be founded thereon. These things are to be done, *as in cases of free white persons.* Upon being thus certified that an offence has been committed, it is made his duty, upon his responsibility as an officer of the State, to prosecute the person (slave) charged, as he would a white citizen charged with an offence against the laws; and the slave, as to all his rights of defence, is put upon the same platform with a white man. He is to be tried only upon bill found true by the Grand Jury, or upon a bill founded on presentment by the Grand Jury. The Court, as before stated, does not derive its jurisdiction from the return of the papers. This is manifest in this, that the Act makes it lawful, independent of them, for the Grand Jury to present to the Court any offence committed by a slave or free person of color in the County; upon which presentment, indictment and trial proceed. Nor do I doubt but that it would be the duty of the Solicitor General, upon information, without such return, to frame a bill, and, if found, of the Court to try a slave or free person of color for a capital offence. The Superior Court, too, being a Court of general jurisdiction, it is not necessary to assert its jurisdiction in these cases, upon its records, as in cases of Courts of limited jurisdiction. With such views of the Act of 1850, we find no error in this assignment.

It is farther assumed, in the assignment, that the Court erred in holding that the Superior Court could rightfully entertain jurisdiction in this case. The argument, if I understood the counsel correctly, divided the question of jurisdiction into two propositions—

1st. The Superior Courts have no jurisdiction, under the Constitution, to try slaves for criminal charges, and the Act of 1850, which confers it, is void for unconstitutionality.

2d. If the Superior Courts have, constitutionally, jurisdiction of capital offences, committed by a slave or free person of color, yet, under the laws of Georgia, they have no jurisdiction of the

offence, to wit: manslaughter, of which the accused was in this case found guilty by the Jury, and cannot, therefore, punish him for that offence.

[2.] We hold that the Act of 1850, giving to slaves and free persons of color the same rights of trial, when charged with capital offences, which the laws accord to white persons, reflects distinguished honor upon the State, and exhibits, in clear and strong lights, the humanity of our laws towards them. They are arraigned upon indictment first passed upon by the Grand Jury—a body of men selected for their wisdom, age and prudence, and on account of the interest which they hold in this, as well as all other kinds of property. They are protected, on the trial, by those forms of pleading and rules of evidence, which, under similar charges, protect the citizen; they are represented by counsel, and are tried by a Jury. Thus it is, that by this Act, as well as by numerous other provisions of the law, whilst they are, in law and in fact, property, they are recognized as human creatures. For the justice and humanity of the slave-holding State of Georgia, an appeal well lies from the slanderous imputations of the ignorant, the fanatical, or the wilfully base, to the law which I now review. On these, as well as other accounts, this Court has been solicitous—indeed anxious—to be able to sustain the Act of 1850. Not that, prior to the Act of '50, the slave and the free person of color had no such rights as that Act guarantees to them, (for in fact, before the Act of 1850, the right of trial by Jury, in capital cases, was secured to them,) but because it subjects them to trial before a higher and more competent tribunal, and with more ample safeguards of right and justice. With satisfaction, therefore, we find it our duty and privilege to sustain the constitutionality of the Act of 1850. The argument, on either side, as to the constitutionality of this law, pursues but a limited range. I shall not weaken what is strong, by any attempt at subtle deductions or remote analogies. So much of the Constitution of the State of Georgia as relates to this subject, is in the following words: "The *Superior* Courts shall have *exclusive* jurisdiction in all criminal cases, (*except as relates to people of color*, and fines for neglect of

duty and for contempt of Court, for violations against road laws, and for obstructing water courses, which shall *be vested* in such judicature or tribunal as shall be or may have been pointed out by law; and except in all other minor offences committed by free white persons, and which do not subject the offender or offenders to loss of life, limb, or member, or to confinement in the penitentiary, in all such cases, corporation Courts, such as now exist or may hereafter be constituted in any incorporated city, being a seaport town and a port of entry, may be vested with jurisdiction under such rules and regulations as the Legislature may hereafter by law direct,) which shall be tried in the County where the crime was committed," &c. &c.   By the Act of 1811, the Legislature gave to the *Inferior Courts* the power to try slaves for capital offences.   The argument for the unconstitutionality of the Act of 1850, which confers that power upon the *Superior Courts,* is as follows : The Constitution gives to the *Superior Courts* exclusive criminal jurisdiction in all cases, *except* as relates to people of color, &c.   The exception denies to the *Superior Courts* jurisdiction, as relates to people of color.   Not only so, but in the excepting clause it declares that jurisdiction, as relates to people of color, in criminal cases, *shall be vested* in such judicature or tribunal as shall be or may have been pointed out by law.   The Legislature, in 1811, by law, in obedience to the mandate of the Constitution, pointed out the Inferior Court, as the tribunal in which criminal jurisdiction, as relates to people of color, in capital cases, should vest, and declared the manner in which that jurisdiction should be exercised.   When the Legislature had acted and ordained a tribunal, as required by the Constitution, for the trial of people of color, the law which embodies that action became fundamental—a part of the Constitution.   As a necessary inference from these propositions, the Act of 1811 is a part of the Constitution, and cannot be repealed by a mere act of legislation; and the Act of 1850, which repeals it, is void, as being repugnant to the Constitution.   In reply, I say that the denial in the exception is not of *jurisdiction,* but of *exclusive* jurisdiction.   The grant to the Superior Court is *exclusive* jurisdiction, in all criminal cases.   The exception

refers to the grant, and is limited by it. The exception, therefore, only denies to the *Superior Court exclusive* jurisdiction, as relates to people of color. Jurisdiction, concurrent with such tribunal as the Legislature might point out for the trial of people of color, remains, under the Constitution, in the Superior Court. And the jurisdiction which the exception declares shall be vested in such tribunal, is not exclusive, but is itself concurrent with that which is left with the Superior Court. This concurrent jurisdiction, which remains in the Superior Court, has been dormant. In point of fact, the Superior Courts never have, so far as I know, exercised it. Certainly not since the Act of 1811, until the Act of 1850, and for this very satisfactory reason: The Legislature, by the Act of 1811, pointed out a tribunal to try people of color; up to 1850, that tribunal was considered adequate to that service. The Legislature did not consider that the necessities of the case required the exercise of this jurisdiction by the Superior Court. They did not, therefore, until 1850, provide by law for its exercise; they did not point out the manner in which the Superior Courts should exercise it; they did point out the manner in which the Inferior Courts should exercise it. The power to try people of color lay, by constitutional deposit, in the hands of the Superior Court, to be sprung into activity, if the Legislature should at any time deem it expedient by proper legislation. Under this view of the subject, it was competent for the Legislature in 1811 to have, by law, declared that the trial of people of color, for capital offences, should devolve upon the Superior Court, as well as the Inferior Court, and to have there pointed out the manner in which the trial before the Superior Court should proceed. So it was competent in 1850, for the Legislature to do the same thing, and equally competent for it to repeal the Act of 1811, and provide, as it did, for the trial of slaves before the Superior Court alone. For I apprehend it is an out-and-out error, to say that when the Legislature in 1811 acted, as authorized to act by the exception in the Constitution, that that Act became a part of the Constitution of the State. If the Constitution was not intended to fix the jurisdiction, as to people of color in criminal cases, exclusively in any

particular tribunal, but left the tribunal, whether the Superior, Inferior or any other Court, to be designated by the Legislature, then what Court should exercise it, was and is a matter of legislative discretion. That such was not the intention of the framers of the Constitution, is manifest in this: that the exception referred to, declares that this jurisdiction shall be vested in such judicature or tribunal as *shall be* or may have been pointed out by law; that is, it is left to the Legislature, by law, to say, in all the future, what existing judicature or tribunal, or tribunal or judicature especially created for the purpose, shall exercise the jurisdiction. And when the Legislature has pointed out the tribunal or tribunals, (in fact they have vested criminal jurisdiction over slaves in more than one,) there, for the time being, the jurisdiction rests. The Legislature is but the minister of the Constitution, to effectuate its provisions, in this regard—it acts by its law-making function. When it acts, as in 1811, like any other law, its action is subject to repeal or to modification; it does not bind future Legislatures. The Act of 1811, like any other law declaratory of the manner in which a constitutional provision shall be carried out, was subject to repeal, and was, as we hold, wisely and constitutionally repealed by the Act of 1850.

The idea that, under the Constitution, the concurrent jurisdiction, of which I have spoken, remains in the Superior Courts, is fortified by a consideration of other exceptions mentioned, to the exclusive jurisdiction of those Courts in criminal cases. Take, for example, fines for contempt of Court: by the argument, if the Legislature had, by law, (which it has not done, because unnecessary,) declared that the Inferior Court should have jurisdiction over contempts, with a power to fine, the Superior Courts would thereby be divested of their power to fine for contempts. But, in that event, could it be believed for a moment that the Superior Court would be divested of its power, incident to all Courts, to fine for contempts? The limitation upon the jurisdiction of the Superior Courts, in this instance, is clearly not intended to inhibit them from punishing for contempts, but to prevent such inhibition to other Courts, by the general grant of exclusive criminal jurisdiction, in all cases, to them. Take, also,

the case of minor offences, committed by free white persons. The jurisdiction, as to this exception, is given to corporation Courts existing, or which may be hereafter constituted, in any incorporated city, being a seaport town and a port of entry. The Legislature has established such a Court in the City of Savannah; but it has never been held, I believe, that the Superior Courts have not there also jurisdiction of these minor offences. The object, in this instance, doubtless was to give concurrent jurisdiction to corporation Courts, with a view to expedite trials, and to disencumber the Superior Court of a part, at least, of that burdensome mass of criminal business with which it would be otherwise oppressed. The same reasons, I have no doubt, gave rise to the exception as to people of color.

But if it be conceded that, under the Constitution, by fair construction, concurrent jurisdiction, as to people of color, is not retained, yet it is clear that it is not *denied* to the Superior Courts. Nothing is denied, as before stated, but *exclusive* jurisdiction. This being so, what is there to prevent the Legislature, as it has done by the Act of 1850, from pointing out the Superior Court as the tribunal to be vested with criminal jurisdiction, as to people of color, in capital cases? Nothing, whatever. It is as free to receive the jurisdiction as any other judicature or tribunal. I concede that *exclusive* jurisdiction, as to people of color, is denied. But the Act of 1850 does not give it exclusive jurisdiction as to people of color; it gives it jurisdiction only as to capital offences—other offences are tried by law before other tribunals. It is exclusive, in fact, as to capital offences, inasmuch as by existing laws no other tribunal can try people of color for capital offences; but in no legal or constitutional sense is it exclusive, because it is legally and constitutionally competent for the Legislature to devolve the same power concurrently on other tribunals, if it thinks fit to do so. We hold, therefore, that the Act of 1850 is constitutional.

[3.] The prosecution, in this case, was not on presentment, but on bill found by the Grand Jury, and under the second proposition stated, as regards jurisdiction, it is insisted that the Court had no power to pass sentence by the Act of 1850, because

Anthony, a slave, *vs.* The State of Georgia.

that Act provides for sentence and punishment only in cases where the prosecution proceeds on presentment. Is this true? The Act declares, "that after a *bill of indictment, found true on presentment made as herein before provided,* the trial shall proceed to rendition of verdict, in conformity with the provisions of the Penal Code of this State, *and in case of conviction, the Judge of the Superior Court, before whom such trial shall have been had, shall pass sentence, in conformity with the laws now in force, imposing penalties, and providing for sentences in such cases."* It is true that the law, in its letter, limits the power of the Judge to pass sentence in a single case, and that is where there is a conviction, *after a bill of indictment found true, on presentment made.* This, like all other Statutes, is open to construction. Should we adopt the construction claimed by the plaintiff in error, and limit the power of the Court to pass sentence to the case of conviction, on a bill found true on presentment made, we would become obnoxious to the maxim, *"qui hæret in littera, hæret in cortice;"* we would verily go but skin deep into the meaning of the Act. The letter of the Act states an impossibility in the law; there is no such thing as a *bill found true on presentment made.* The Jury find a true bill or not, when a bill is laid before them, by the prosecuting officer, for their consideration. When they *present,* the bill is framed on the presentment, and is never sent to them for a finding. If the plaintiff's construction be the true one, and if there can be no bill found true on presentment made, the result is more serious than what he claims it to be, for there could be no sentence and no punishment in any case under this law; the whole Act would be an absurdity—a law which authorizes a trial without power to inflict punishment. It is our duty to give effect to it. The meaning of the Legislature is plain, and is not expressed fully, because, either in the drafting or the printing, the alternative little word *or* is omitted. They intended, no doubt, to say, "after a bill of indictment found true *or* on presentment made." This is clear by the intent and purposes of the whole Act; it is especially manifest in the words " as hereinbefore provided," which follow immediately the clause last quoted. These words refer to the provisions of the first section,

which authorize the Solicitor General to frame and send a bill before the Grand Jury, to be found by them true or no bill, and which also authorize the Grand Jury to present. By the Act, the prosecution against the slave may originate with a bill sent before the Grand Jury, or in a presentment by the Jury. In either case, the Court proceeds to try, and, in case of conviction, to pass sentence. This interpretation makes the clause under review consistent with the whole Act, and relieves the Legislature of the imputation of having legislated absurdly. Can we add the word *or*? In just such a case, I have no doubt, we can. It is not an Act of legislation, but the reading of an Act which the clear meaning requires. We are not bound to decide according to the strict letter of the Act, but the real intention will prevail over the literal sense of terms. 3 *Reps.* 27. 1 *Kent*, 462. *Smith's Commentaries*, 662. 15 *Johns. R.* 380. 14 *Mass.* 92. *Plowd.* 289. 1 *Jarman on Wills*, 443, *et seq.* 7 *T. R.* 509. 11 *Rep.* 73. *Coke Litt.* 381, *h.*

Again: it is said that the Court could not pass sentence in this case because the verdict was manslaughter—the Act of 1850, conferring jurisdiction only in capital cases, and manslaughter not being a capital offence, when committed by a slave. The slave was indicted for murder; that being a capital offence, the Court clearly had jurisdiction of the cause. Upon this indictment, it was competent for the Jury to find the prisoner guilty of manslaughter. In just such a case, the Act of 1850, together with the Act of 1821, confer the power to punish. The former Act declares that, in case of conviction, (not of a capital offence, but generally,) *upon bill of indictment or presentment for* a capital offence—for that is the meaning of the law—*the Judge shall pass sentence in conformity with laws now of force, imposing penalties and providing for the passing of sentence in such cases.* For the sentence, the Act of 1850 remits the Court to the laws now in force, which impose penalties and provide sentence in such cases. What cases? Cases of indictment for capital offences. Well, the latter Act—the Act of 1821—declares "that whenever a slave or free person of color is brought before the Inferior Court, to be tried for an offence deemed capital, it shall be the duty of

said Court to pass such sentence as may be pointed out by law for the offence of which such slave or free person of color may be guilty; *and in case a verdict of manslaughter shall be found by the Jury, the punishment shall be by whipping, at the discretion of the Court, and branded on the cheek with the letter M.* Prince, 799. Here, then, is a law which provides punishment for this case—a case where a slave, indicted for murder, is found guilty of manslaughter. It provides a penalty, and for a sentence in this case. It is not only not repealed by the Act of 1850, but is made part and parcel of it, by express reference. So far as it refers to the *Inferior* Court, it is repealed by the Act of 1850, but is, by that Act, declared in force, so far as it provides a penalty, and for a sentence in the case made in this record.

Let the judgment be affirmed.