## JOURNAL PUBLISHING COMPANY v. E. F. BARBER.

(Filed 6 May, 1914.)

### 1. Principal and Agent—Ratification—Acceptance of Benefits—Contracts—Repudiation in Part.

Where the agent has, with the authority of his principal, made a sale of a machine, representing it as his own, but owned by this principal, to a corporation, and has exceeded his authority, with the knowledge of the principal, in taking shares of the corporation's stock in payment, in which transaction the principal has received and knowingly retained a substantial benefit, the principal may not repudiate the transaction in part by retaining the benefits, and repudiate that part which appears to him to be to his disadvantage, and where, under such circumstances, the parties may not be placed, by a court of equity, in *statu quo*, the transaction will not be disturbed.

### 2. Equity—Debtor and Creditor—Payment—Volunteer—Subrogation by Implication.

One who acts under a *bona fide* and reasonable belief that he is bound to the payment of a debt of another secured by a lien or mortgage or otherwise, is, on making payment thereof, subrogated to the rights of the creditor in the securities, for while ordinarily the payment of a debt by a stranger, a mere volunteer, without request from the debtor, extinguishes the original obligation and releases the securities, the doctrine of subrogation may arise from implication, depending upon the equities surrounding the particular transaction, which are to be administered according to their priorities.

### 3. Same—Principal and Agent—Husband and Wife—Parties.

A., the wife of B., purchased a Mergenthaler type machine, paid part of the purchase money, gave a chattel mortgage to secure the deferred payments, and B., her husband, acting as her agent, and with authority to sell the machine, but dealing with the plaintiff corporation as the owner, and so representing himself, contracted to sell the machine to the plaintiff, under an agreement that the plaintiff would pay with its stock the amount paid to the vendor of the machine, assume the deferred payments, and to meet some of them, the plaintiff gave its note to the agent, which the latter discounted at a bank and applied the proceeds accordingly, the plaintiff having paid this note since the institution of this action: *Held*, (1) A., the principal, was

PUBLISHING CO. v. BARBER.

not a necessary party to the suit, as she had assigned all her rights. (2) The plaintiff was entitled to subrogation, for the partial payment, *pro tanto*. (3) The mortgage creditor, who accepted the partial payment was the only one who could object to the plaintiff's right of subrogation, and as he had been fully satisfied, it was held that A. and her assignee, the defendant, having received and knowingly retained the benefits of the transaction, would, under the circumstances, have no cause of complaint, and could not prevent subrogation.

4. **Equity—Subrogation—Volunteer—Payment—Debtor and Creditor —Rights of Debtor.**

One who is otherwise entitled to subrogation to the rights of the creditor in a mortgage of the principal debtor pledged for the payment of the debt will not be denied this right *pro tanto*, upon making a partial payment thereon, when the creditor does not object or his equities are not interfered with, there being no intervening prior equity.

APPEAL by defendant from *Lane, J.,* at September Term, 1913, of FORSYTH.

These are the facts of the case, so far as necessary to state them: Mrs. Julia Gray Moore, wife of F. A. Moore, while they lived in Goldsboro, N. C., where Mr. Moore was connected with the *Argus,* a newspaper published in that city, purchased of the Mergenthaler Linotype Company one of its linotype machines for $3,315, paying for the same in cash down, $1,000, and giving her several notes for the balance, secured by a chattel mortgage on the machine, which was duly registered. Mrs. Moore afterwards paid $390 by taking up two of the notes for $195 each, making $1,390 paid in all. They then moved to Winston-Salem, N. C., where Mr. Moore formed a connection with the plaintiff company, as business manager and editor. As the company needed money to continue the publication of its paper, and Moore was short of funds to pay his part, it was agreed that the company should buy the machine, giving its note to Moore for $575 and assuming the indebtedness to the Mergenthaler Company remaining after discounting the said note and applying the proceeds, $550, to three of the notes held by the Mergenthaler Company of $195 each, which were then over-

due, the Publishing Company agreeing to issue $1,390 of its stock to pay for the equity of Mrs. Moore in the machine, that being the amount she had paid on the purchase. There was evidence that this transaction was conducted by Mr. Moore in his own name, and apparently for his own benefit, as if he was the owner of the machine, though plaintiff contended that he was acting for his wife, as her agent to sell the machine, and with her full knowledge and authority to make the sale. It appears in the record that there was evidence to support this contention. When informed of the terms of the sale, Mrs. Moore declined to be bound thereby with respect to the plaintiff's stock, and demanded that cash for the $1,390 be paid, or a good bankable note for the amount be given to her. The note of plaintiff for the $575 was discounted at bank, and the proceeds, $550, applied to the Mergenthaler notes; but before this was done, plaintiff acquired knowledge of the fact that Mrs. Moore, and not Mr. Moore, owned the machine, and that Mrs. Moore had paid the $1,390 on the purchase money of the machine; but it acted upon the assumption, when the $575 note was discounted, that Mr. Moore was acting for his wife. Mrs. Moore testified, substantially, that while she knew that her husband was acting in her behalf, and was negotiating with plaintiff for the sale of the linotype to it, and assented thereto, she did not authorize him to take any stock as part of the purchase money, and repudiated what he had done in that respect as soon as she heard of it. There was evidence that Barber, the defendant, bought with full knowledge of plaintiff's rights, and has been indemnified against any loss.

Plaintiff brought this action for the purpose of being subrogated to the rights of the Mergenthaler Company to the extent that the proceeds of the discounted note, $550, had paid off its claim, and to that end it prays that the machine may be sold and the proceeds paid out according to the interest of the parties.

The jury returned the following verdict:

1. Did the plaintiff, at the request of F. A. Moore, advance $575 to be used in taking up three notes, due respectively 14

September and December, 1909, and 4 March, 1910, which notes were secured by the deed of trust on the linotype machine described in the pleadings? Answer: Yes.

2. If so, at the time of such advancement, had the said F. A. Moore contracted to sell to the plaintiff, and had the plaintiff agreed to buy said linotype machine, as alleged in the complaint? Answer: Yes.

3. What part, if any, of the said $575 was actually used toward the payment or discharge of said notes? Answer: $550.

4. Was the said F. A. Moore acting as the agent or to the knowledge of his wife, Julia Gray Moore? Answer: Yes.

5. At or prior to the time the defendant purchased and paid for said linotype machine, did he have full knowledge of said plaintiff's claim? Answer: Yes.

6. If so, did the plaintiff, prior to the payment of the purchase money, notify defendant that it waived any claim it might have against said machine? Answer: Yes.

6½. Did the plaintiff, prior to the payment of the purchase money, renotify the defendant of its rights and equities against the machine? Answer: Yes.

7. Has the said Julia Gray Moore accepted the benefit of the money advanced by the plaintiff and applied on her mortgage indebtedness by her said husband, and ratified the same? Answer: Yes.

8. Is the plaintiff entitled to a lien on said machine to the amount paid by it on the mortgage indebtedness of the said Julia Gray Moore? Answer: ........

9. Did Julia Gray Moore, prior to the sale of the machine to the defendant, have knowledge of the advancement of $575 by the plaintiff to her husband, which had been used to discharge the notes? Answer: Yes.

10. Was Mrs. Julia Gray Moore the owner of the linotype machine at the time the said three notes were paid off by the plaintiff? Answer: Yes.

Judgment was entered on this verdict for the plaintiff, and defendant appealed.

165—31

*A. H. Eller and Manly, Hendren & Womble for plaintiff.*
*. Manning, Everett & Kitchin for defendant.*

WALKER, J., after stating the case: There are two questions presented in this case, one arising out of the equitable principle of subrogation and the other out of the law of agency. Defendant Mrs. Moore contends that the plaintiff has not brought itself within the protection of the doctrine of subrogation, because, first, her husband was not authorized to contract with plaintiff in respect to the sale of the Mergenthaler linotype so as to bind her; second, that the full amount of the debt owing by her to the Mergenthaler Company was not paid from the proceeds of plaintiff's discounted note, but only a part thereof, and, third, that plaintiff was a mere volunteer and under no legal obligation to pay the debt, even *pro tanto.* She also contends that plaintiff did not pay the note given to Mr. Moore until after the commencement of this action; and, lastly, that she is a necessary party to this suit to protect her interests.

We are satisfied, from Mrs. Moore's own testimony, that there was sufficient evidence of her husband's agency to be left to the jury. It appears therefrom that she knew he was assuming to act for her in the pending negotiations for the sale of the linotype to plaintiff, and being aware of this fact, if she had not consented to his doing so, it was her plain duty to disavow his act, in order that the plaintiff would not be prejudiced by his false assumption of authority. But there is additional proof that he was so acting, not only with her knowledge, but with her express consent. This being so, it is clearly established that, where an agent exceeds his authority, his principal must either wholly ratify or wholly repudiate the transaction. He cannot accept the beneficial part and reject what is left of it. 31 Cyc., 1257, 1258; *Rudasill v. Falls,* 92 N. C., 222.

In the case just cited, *Chief Justice Smith* says:

" 'The principal cannot, of his own mere authority, ratify a transaction in part and repudiate it as to the rest,' is the language of *Mr. Justice Story* in section 250 of his work on

Agency. 'He must either adopt the whole or none.' Another recent author lays down the same doctrine thus: 'A nullification must extend to the whole of a transaction.' So well established is this principle, that if a party is treated as an agent in respect to one part of a transaction, the whole is thereby ratified. From this maxim results a rule of universal application, that where a contract has been entered into by one man as agent for another, the person on whose behalf it has been made *'cannot take the benefit of it without bearing its burdens.* The contract must be performed in its entirety.' Ewell's Evans' Agency, 70 (Ed. of 1879, p. 95). The rule rests upon sound reason and abundant authority. *Crawford v. Barkley,* 18 Ala., 270; *Hodnett v. Tatum,* 9 Ga., 270; *Bank v. Hanner,* 14 Mich., 208; *Coleman v. Itache,* 1 Ore., 115." See, also, *Christian v. Yarborough,* 124 N. C., 72.

Mrs. Moore and her assignee, the defendant E. F. Barber, have received the benefit of the reduction in the mortgage indebtedness by the payment thereon of the proceeds of the discounted note given by plaintiff to Mr. Moore, agent of his wife, but they now insist upon retaining the same, and have made no offer to return the amount thereof to plaintiff, so that the parties can be placed in *statu quo.*

Plaintiff was not a volunteer. It acted upon the *bona fide* belief, and had the right to do so, that Moore either owned the machine himself or had authority from his wife to sell it, if she owned it. There is no evidence that plaintiff did not act honestly in the transaction. It was attempting in good faith to protect its own interests in what it believed to be a rightful sale of the property to it. The fact that it may have been mistaken in this belief does not make it a volunteer, while it is true that a mere volunteer or intermeddler who, having no interest to protect and without any legal or moral obligation, pays the debt of another, is not entitled to subrogation without an agreement to this effect, or an assignment of the debt, and that the payment by him absolutely extinguishes the debt. It always requires something more than the mere payment of a debt in order to entitle the person paying the same to be substituted in

the place of the original creditor. There must be the discharge of a legal obligation for another who is under a primary obligation, for no man can make another his debtor without his consent, and only a creditor or person under liability can invoke the doctrine, there being no debt, there can be no ground for subrogation. Furthermore, the payer must have acted on compulsion to save himself from loss, and it is only in cases where the person paying the debt of another stands in the relation of a surety, or is compelled to pay in order to protect his own interests or by virtue of legal process, that equity substitutes him in the place of the creditor without any agreement to that effect; in other cases the debt is absolutely extinguished. 37 Cyc., 375.

Volunteers, in the absence of some special circumstance upon which they can base their claims, can obtain the equal right to be subrogated only by virtue of an agreement, express or implied, or by request from the debtor to pay, which is in effect an implied contract, or by ratification, or by taking an assignment of the debt. But payments made in ignorance of the real state of facts cannot be said to be voluntary, and a person who has paid a debt under a colorable obligation to do so, that he may protect his own claim, or under an honest belief that he is bound, will be subrogated; and a person who mistakenly, but in good faith, believes that he has an interest in property, to protect which he discharges a lien, is subrogated to the lien for his repayment; and subrogation is sometimes extended to cases of payment by persons not legally bound to pay, but who do so, not as volunteers, but with a well-founded expectation, justified by the conduct or the contract of the debtor, that they will be entitled to hold the securities for their indemnity which the creditor had against the debtor; and in one jurisdiction it has been held that a stranger who pays a debt without request by the debtor, when his payment is not ratified by the debtor, may bring a suit in equity, praying relief in the alternative, that if the debtor do not ratify such payment the debt may be enforced in his favor as its equitable assignee, or, if so ratified, that he be decreed repayment of the

amount paid for the use of the debtor. "Payment under a moral obligation is not voluntary." 37 Cyc., 376 to 379 and notes.

Mr. Sheldon, in his standard treatise on the Law of Subrogation, states the rule clearly, with apt illustrations and examples, in section 36: "The right of subrogation does not depend upon the validity of the title of the person claiming to be reimbursed for his payment in discharge of a prior encumbrance. It is merely necessary that his payment should have been made in good faith for the protection of an interest which he believed himself to have in the estate, and in discharge of a burden actually resting upon the property, so that his payment has increased the value of the estate for the benefit of those who turn out subsequently to be owners of title. The benefit of subrogation has accordingly been allowed to one who held merely an invalid or a verbal contract for the conveyance of the land which he has freed from an encumbrance; to the assignee of one who held such a contract; to one whose only title was under an invalid mortgage, or under a voidable decree; to one who claimed only under a void or a voidable sale, even after the avoidance of the sale by order of court; to an unsecured creditor who has paid off a mortgage debt in compliance with an erroneous order of court; to a devisee who has only a contingent remainder in the encumbered estate, and to one who holds merely an equitable lien upon the property. If he *bona fide* claims an interest, he is not a mere volunteer, and may be subrogated, but he must show that he had or supposed he had some interest to be protected."

And again, at section 247: "One who pays a debt at the instance of the debtor, under such circumstances that it appears to have been contemplated by the parties that he should become entitled to the benefit of the security for the debt held by the creditor from the debtor, may, as against the debtor and the debtor's estate, be subrogated to the benefit of such security and of the debt which he has discharged. And a party who has paid a debt at the request of the debtor, under circumstances which would operate a fraud upon him if the debtor

were afterwards allowed to insist that the security for the debt was discharged by his payment, may also be subrogated to the security, as against the debtor." He then adds that while the right will not be enforced in favor of a mere volunteer or stranger, who was under no obligation to pay the debt, or any part of it, yet if it may be gathered from the circumstances attending the transaction that it was not intended to extinguish the debt, but the payment was made in reliance upon the security, a species of conventional subrogation arises by implication. One who had paid off a mortgage debt under the mistaken belief that the title to the land was in his wife, while it really belonged to her daughter by a previous marriage, was allowed against the daughter a charge upon the land to reimburse him for this payment. So the lender of money borrowed by a corporation *ultra vires* may be subrogated to the rights of lawful creditors of the company who have been paid out of such money, and allowed to recover from the company to the extent of the lawful liabilities so paid off.

For the prevention of fraud, a person who advances money to pay off a mortgage, believing that it was the only lien upon the land, may be subrogated to the lien of that mortgage, as against a surety who has paid a judgment which was a lien subsequent to the mortgage, and the payment of which appeared by the record to have been otherwise provided for. Sheldon on Subrogation, pp. 30, 31, sec. 19, citing *Haggerty v. McCanne,* 25 N. J. Eq., 48; *Brooks v. Blackburn Benefit Society,* 1 App. Cases (Eng.), 857; *B. B. Society v. Cunliff,* 22 Ch. Div., 61; *Wenlock v. River Dee Co.,* 19 Q. B. Div., 155.

It has been held that though a mere volunteer cannot, by paying off a mortgage, acquire an equitable lien or any right of subrogation, yet if he advances the money to redeem or pay off a mortgage at the request of one who is interested or bound to discharge it, he may be protected against such person by subrogation. Sheldon on Subrogation, p. 31; *Gans v. Thieme,* 93 N. Y., 225, and other cases cited by Sheldon in note 6, p. 31.

In the case of *Gans v. Thieme, supra,* the Court said: "It is no doubt true, however, as the learned counsel for the re-

spondent argues, that a volunteer cannot acquire either an equitable lien or the right to subrogation (*Sandford v. Mc-Lean,* 3 Paige, 122; *Wilkes v. Harper,* 1 N. Y., 586; 2 Barb. Ch., 338); but one who, at the request of another, advances his money to redeem or even to pay off a security in which that other has an interest, or to the discharge of which he is bound, is not of that character, and in the absence of an express agreement, one would be implied, if necessary, that it shall subsist for his use, and it will be so enforced. But the doctrine of substitution may be applied although there is no contract, express or implied. It is said to rest 'on the basis of mere equity and benevolence' (*Cheeseborough v. Millard,* 1 Jons. Ch., 409; 1 Story's Equity Jurisprudence, sec. 493), and is resorted to for the purpose of doing justice between the parties. . . . It will subserve the purposes of justice and violate no rule of law to subrogate them to the lien of the mortgage as against any of the parties to this action, since their title was affected by it (*Barnes v. Mott,* 64 N. Y., 397; 21 Am. Rep., 625), and no wrong can be done to either by putting the plaintiffs in the place of the original creditor."

Bispham on Equity, at p. 454, states that where a debtor borrows money for the purpose of discharging a lien, the person thus advancing the money may be subrogated by the debtor to the creditor's rights, and is not to be deemed a volunteer. And this result may follow in certain cases even where no such express agreement for subrogation exists. No general rule, in short, can be laid down. Each case must be decided on its own merits, citing *H. L. B. Association v. Fire Association,* 180 Pa., 522.

Let us consider for a moment the elementary conception of subrogation and its primary elements. It is the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt. The doctrine is one of equity and benevolence, and, like contribution and other similar equitable rights, was adopted from the civil law, and its basis is the doing of complete, essential, and perfect justice between all the

parties without regard to form, and its object is the prevention of injustice. The right does not necessarily rest on contract or privity, but upon principles of natural equity, and does not depend upon the act of the creditor, but may be independent of him and also of the debtor. While subrogation is not founded on contract, there must, in every case where the doctrine is invoked, in addition to the inherent justice of the case, concur therewith some principle of equity jurisprudence as recognized and enforced by courts of equity. Where the right of subrogation exists, it is subject to prior equities and all the rules of equity. The subrogation just described is very generally referred to as legal subrogation to differentiate it from conventional subrogation or subrogation arising from express contract between the payer and the debtor or creditor that the payer shall be subrogated, rather than from the automatic operation of a rule of law upon a given set of circumstances. Conventional subrogation or subrogation by act of parties may take place by the debtor's agreement that one paying a claim shall stand in the creditor's shoes, and furthermore can arise only by reason of an express or implied agreement between the payer and either the debtor or the creditor, and the agreement, like other agreements, must be supported by a consideration. It is not essential to subrogation by convention that the creditor should be a party to the agreement between the debtor and a third party, provided no intervening rights to the security have occurred; but subrogation by convention is not applicable where it would prejudice the rights of innocent parties. 37 Cyc., pp. 363 *et seq.* The nature and grounds of subrogation are very clear. The difficulties arise in its application to the innumerable complications of business. The courts incline, however, rather to extend than restrict the principle, and the doctrine has been steadily growing and expanding in importance, and is becoming more general in its application to various subjects and classes of persons, the principle being modified to meet the circumstances of cases as they have arisen. 37 Cyc., p. 373. The doctrine has been applied much more extensively, it has been said, in the courts of this country than in English

jurisprudence, under the initial guidance of *Chancellor Kent.*

Applying these principles to our case, and the right of the plaintiff to this equity clearly appears. There was good ground for it to believe that Mr. Moore was acting within his authority, either personal or representative, and the plaintiff acted in good faith, believing that it was acquiring a perfect title to the machine; it made the note for the purpose of being discounted, so that the proceeds might be applied to the payment of the notes then due, and they were so applied; it paid the notes in the protection of the interest in the property which it then believed would pass to it under the contract with Mr. Moore. It acted prudently and not rashly, in view of the facts and circumstances as they then appeared to be. Mrs. Moore has received and she and defendant now enjoy the benefit of the payment.

Sheldon almost states our case at section 19: "Where a person advances money to pay off a mortgage debt under an agreement (express or implied) with the owner of the equity of redemption or his representative that he shall hold the mortgage as security for his advance, but the mortgage, instead of being assigned to him, is discharged in whole or in part, he is yet entitled as against subsequent parties in interest to be subrogated to the rights of the mortgagee and to enforce the mortgage."

Cases in our own reports illustrate the doctrine that though the party who makes the payment may, in fact, have no real or valid legal interest to protect, he may yet be subrogated when he acts in good faith, in the belief that he had such interest. An administrator who had paid the debts of his intestate to a larger amount than the assets in his hands was, in equity, substituted to the rights of the creditors whose claims he had thus satisfied, and recovered of the heir the sum overpaid. *Williams v. Williams,* 17 N. C., 69. The Court said his act was not officious nor the act of a mere stranger who endeavors to make one his debtor by payments on his account which were made against his will and without his request. He was not an intermeddler, if he acted in good faith, nor was it a

mere act of "unauthorized forwardness" beyond his known obligations and duty. *Sanders v. Sanders,* 17 N. C., 262. And so, in *Scott v. Dunn,* 21 N. C., 425, where an executor had sold lands of his testator without any authority to do so and under a mistake of his power, and applied the proceeds to the payment of the debts, and the purchaser was evicted by the devisee, the land was subjected, in equity, to indemnify the purchaser to the extent of the payment on the debts, and so far as the personal property was not sufficient to pay them. *Judge Gaston* said, at p. 427 : "As between Dunn and the plaintiffs, if their money were yet in his hands, he could not retain it with a safe conscience, and would be obliged to refund it. And it seems to us clear that if he could rightfully reclaim it from his codefendants, he might be compelled to assert this right, or permit the plaintiffs to assert it in his name, in order that it might be refunded. The court would do this upon the same principle by which the surety, on making satisfaction to the creditor, becomes entitled to demand every means of enforcing payment which the creditor himself had against the principal debtor: a principle which, when traced to its origin, is founded on the plain obligations of humanity which bind every one to furnish to another those aids to escape from loss which he can part with without injury to himself. (Home's Prin. of Equity, 84.)" See, also, *Springs v. Haven,* 56 N. C., 96; *Perry v. Adams,* 98 N. C., 167; *Smith v. Brown,* 101 N. C., 349.

In *Springs v. Haven, supra, Judge Pearson,* referring to an unauthorized sale by Lewis Dinkins, as executor of Thomas Kendrick, said: "To mend this difficulty, the plaintiffs must have recourse to another well established doctrine of this Court, namely, that of 'substitution.' According to this doctrine, the plaintiffs (as purchasers) are not entitled *to the land,* but have an equity to be substituted in the place of the creditors of Kendrick, whose debts were paid with the money received from Lewis Dinkins, arising from the sale of the land. That money discharged debts for which the land was liable, and as the defendants take the land, of course they take it subject to the repayment of the money by means of which the land was exoner-

ated. *Scott v. Dunn,* 1 Dev. and Bat. Eq., 425, is in point as to the application of the principle, and also as to the mode of redress. There it is said: 'The doctrine of substitution is not founded on contract, but on the principle of natural justice. Unquestionably the devisees cannot be injured by the mistake of the executor as to the extent of his power over the land, but that mistake should not give them *unfair gain.'* "

In our case the principles of equity require, in order to do justice, that plaintiff should be substituted *pro tanto* to the rights of the mortgagee as against the property now in the hands of the defendant, unless the other objection of defendant should be allowed to prevail.

It is contended that a payment of a part of the secured debt is not sufficient to induce the court to act in behalf of the plaintiff. But this is an erroneous view of the principle invoked, in its application to the facts. The general principle undoubtedly is that such a payment will not be sufficient, but there are exceptions to this rule.

37 Cyc., p. 409, thus states this doctrine and its limitations: "A *pro tanto* assignment or subrogation will not be allowed, and the same rule applies to an indorser. But although the rule is sometimes narrowly stated that the surety is not entitled to subrogation until he has paid the entire debt, if a surety pays part of the debt and the principal the balance, the surety will be subrogated to all the benefits which the creditor had against the principal to the extent of his payment, and in general it is sufficient if the balance of the creditor's debt has been otherwise satisfied. Nor is it essential that the surety should have paid the full amount of the debt in money, provided the creditor be satisfied; if he has discharged the burden, leaving in the creditor nothing further to demand, he will be entitled to subrogation, but only for indemnity to the extent of the money paid or value of the property applied."

It will be seen that this principle of *pro tanto* subrogation applies except where it interferes with the rights of the creditor holding the security, and a part payment is sufficient as against the debtor and mortgagor to raise the equity in behalf of the

one who has made the partial payment. He is entitled to the benefit of the equity, but subordinate to the creditor's prior right, and the latter must not be prejudiced by allowing it. 37 Cyc., 409 and 410. At the latter page it is said: "Only a creditor holding the securities can object to a subrogation *pro tanto* of a surety who has paid a portion of the debt, whether the surety has entirely satisfied the debt or not, and the creditor may allow the surety to be subrogated before the indebtedness is wholly satisfied." "He (the party making the payment) will not be subrogated to the benefit of the mortgage *as against the others who are secured* thereby, by his having furnished the debtor with the means to make a partial payment of the mortgage debt, even though he holds the agreement of the mortgagor that he shall be protected by the mortgage. The mortgagor's agreement cannot prejudice the mortgagees, though it would bind the mortgagor himself." (Italics ours.) Sheldon, sec. 19; *Cameron v. Tome,* 64 Md., 507; *Haven v. R. R.,* 109 Mass., 88. Sheldon, sec. 128, also states this principle with clearness: "It is the creditor who is entitled to satisfaction; and neither the debtor nor any other creditors can object to any arrangement between the surety and the creditor for the subrogation of the surety, whether the latter has or has not completely satisfied the debt. . . . If the principal debtor has himself paid part of the indebtedness, and the surety only the balance, yet, when once the creditor is wholly satisfied, the same principle of equity which substitutes the surety who has paid the whole debt to the place of the creditor will equally protect the surety paying a part thereof, to the extent of his payment. A partial payment is sufficient to establish the surety's right as against the principal, or any one standing in the place of the principal; it is only the creditor who can insist that the debt must be paid in full. Nor need the surety's payment be in money; whatever is accepted by the creditor as a payment, so as to discharge the principal debtor from his liability, will operate as a payment in favor of the surety. But until the creditor has been paid in full, the surety cannot, against the will of the creditor, in any manner interfere with the latter's rights or

securities, so as to put him to an embarrassment in collecting the remainder of his demand. If the surety has made partial payments upon a debt secured by a mortgage from the principal debtor, then upon foreclosure any surplus proceeds over the amount needed to pay the creditor in full must be applied to repay the surety." See, also, *Gedge v. Matson,* '25 Beav., 310; *Comins v. Culver,* 35 N. J. Eq., 94; *Rooker v. Benson,* 83 Ind., 250.

It will be seen from these authorities that the *creditor* alone can object to subrogation under a partial payment, and only to the extent that it would impair his preferred rights. The last reference to Sheldon also answers the other objections.

Here the original creditor, the Mergenthaler Company, has been satisfied and retired from the transaction, and has no further interest in it, and before this occurred, it had accepted the proceeds of the discounted note as a payment *pro tanto,* and this satisfied the debt to its amount. The position of the defendant, that the note was not paid until after the suit was brought, and therefore there was no payment before and consequently no cause of action, is clearly untenable. It is payment to the creditor, or what he accepts as payment, and not the manner of raising the money, that brings into play the equity of subrogation, and it makes no difference that the note upon which the money was procured by discount had not been paid when the suit was commenced. Plaintiff was liable upon it to the bank at which it was discounted. Equity does not regard the form, but the substance, of the transaction. The creditor's debt was satisfied *pro tanto* by the discount and application of the proceeds, even though plaintiff's note was not paid.

The principle stated in the authorities cited by defendant (Van Zile on Equity Pleading and Practice, secs. 446, 448, 450; 4 Pomeroy's Eq. Jur., sec. 923, and *Sanford v. McLean,* 23 Am. Dec., 773) are not at variance with those expressed herein, but in perfect harmony with them, when rightly considered and applied. In the law of subrogation, the distinction between a mere voluntary or intermeddler and one who pays in the protection of a right or interest, believed to be good, though it may

turn out afterwards to be an invalid one, is well marked by the authorities, and the limitations of the principle, as to a partial payment, is also clearly defined.

Our conclusion is that plaintiff is entitled to subrogation as against Mrs. Moore, and her assignee, the defendant Barber, who had full notice of the equity. He has received a direct benefit in the reduction *pro tanto* of the debt he had to pay to the Mergenthaler Company, as a part of the price, in the purchase of the linotype, and, besides, he has been fully indemnified against all loss, and therefore has no ground of complaint against the decree.

The only difficulty we have had in deciding the case is upon the last question. Mrs. Moore moved to be made a party in order to protect her interests. So far as the record shows, she has parted with all of her interest in the machine, and it does not appear that she will be answerable over to the indemnitors of the defendant. So it follows that, upon the present record, as the facts now appear, she has no interest to protect. But while this is apparently true, and while we have considered the case upon the conceded facts, and her own testimony, and it would seem to be clear, therefore, that she will not be prejudiced by the refusal of the court to make her a party, we do not see how the facts can be changed at all by her presence as a party in the case. We have held that she is bound by her husband's apparent, if not real, authority to act as her agent in making the sale, and while, perhaps, not bound by the terms of the sale to plaintiff, under which she was to receive stock instead of cash, she cannot repudiate the invalid part of the transaction without restoring what she has received in the way of benefit to herself. Equity requires this to be done in the adjustment of the matter. As to the principle of subrogation, its object is, as we have seen, to place the ultimate liability where, in equity and good conscience, it should rest, that is, upon the person who should discharge it, and that is the effect of our decision. So that, upon the real merits of the controversy, in any view of it, the law is against the defendant. The

ROBINSON *v.* MANUFACTURING CO.

reason for the rule of subrogation, that the burden should rest upon the person ultimately liable, was strikingly illustrated in the recent case of *Barber v. Hanie,* 163 N. C., 588.

No error.