ROSA S. KENNEDY v. ATLANTIC TRUST AND BANKING COMPANY.

(Filed 20 October, 1920.)

1. **Principal and Surety—Payment—Bills and Notes—Notes—Mortgages —Evidence—Husband and Wife.**

When money is loaned to the husband for the prosecution of his business, secured by a chattel mortgage on his own property, and the wife appears on the note as a joint maker, and the note is further secured by a mortgage on their lands held in entireties: *Held,* a payment of the note by the proceeds of an agreed sale of the personal property of the husband, also discharges the mortgage on the realty, and the liability of the wife as surety on the note; and as between the original parties it may be shown that the wife signed as surety and not as a joint maker thereof.

2. **Equity—Subrogation—Mortgages.**

The attorney of a mortgagee had charge of an arrangement whereby a private sale was effected under agreement that the proceeds, sufficient for the purpose, were to discharge the mortgage debt, and the mortgagee gave a third person authority to collect the money and pay it accordingly. The attorney voluntarily guaranteed the payment of the money, and, *Held,* the equitable right of subrogation to the mortgagee's right, if any, was not available to him, he not having an interest to protect, or being in any manner liable for the debt.

3. **Principal and Surety—Bills and Notes—Notes—Evidence.**

A wife signing a note with her husband for a loan made to him personally by a bank may show, as between the original parties, that she signed as surety, and this principle applies to an attorney or agent of the payee, who, fully aware of the transaction, voluntarily paid the note and claims the equity of subrogation to the rights of the payee.

4. **Principal and Surety—Equity—Exoneration—Bills and Notes.**

Where the wife is surety on her husband's note, secured by a chattel mortgage on his property, and also by mortgage on lands held by them both in entireties, evidence of the value of the chattels covered by the mortgage, privately sold, under an agreement with the mortgagee that the proceeds should satisfy his debt, is admissible upon the question of exoneration of the surety, and the mortgagee having received the proceeds of the sale or the benefit thereof.

5. **New Trials—Appeal and Error—Substantial Injustice.**

Mere errors on the trial that have not worked substantial injustice to the appellant will not entitle him to a new trial.

APPEAL by defendant from *Allen, J.,* at October Term, 1919, of NEW HANOVER.

This is an action brought by plaintiff to restrain defendant from foreclosing a mortgage made by her to defendant. The mortgage was made on 31 October, 1911, to secure two notes, under seal, of $750 each, one payable one year after date, and the other two years after date, both

signed by plaintiff and her husband on 31 October, 1911. After the maturity of the two notes, the defendant, on 29 October, 1915, under the power in the mortgage, advertised the property for sale on 29 November, 1915, when the plaintiffs sued out an injunction, which was continued to the hearing.

The plaintiffs claimed in their complaint:

1. That the plaintiff mortgaged her interest in the land with her husband, which was an estate by entirety, with the understanding and agreement between her and defendant that defendant would exhaust the mortgage on the personalty before selling the realty; and,

2. That there was an agreement between plaintiff's husband and the defendant bank that $1,500 of the purchase-money of the restaurant, which was sold, should be applied to the discharge of the indebtedness of plaintiff to the bank.

This was denied in the answer, and thereon issues of fact and law arose.

Defendant's second assignment of error is the failure of the court to nonsuit the plaintiff at the close of plaintiff's testimony, the motion having been renewed at the close of all the testimony.

The following facts appear to be practically undisputed, though they may not be admitted by the pleadings. On 31 October, 1911, J. R. Kennedy, the husband of the plaintiff, owned and was conducting a restaurant in the city of Wilmington, and for reasons satisfactory to Kennedy, he applied to the defendant for a loan, offering the restaurant business and its fixtures as security therefor by way of mortgage on the restaurant furniture and fixtures, and certain real property described in the mortgage. At that time J. R. Kennedy and his wife owned, as tenants by entireties, the real estate covered by the mortgage afterwards executed and attempted to be foreclosed under the power of sale, which foreclosure was restrained by the court.

At the time of J. R. Kennedy's application for the loan from the bank, the real estate owned by him and his wife was mortgaged to the Peoples Savings Bank for $500, as Kennedy wanted money to purchase improvements and equipment for his restaurant. The result was that the bank required the payment of the People Bank's prior mortgage for $500, and loaned Kennedy $1,500; $500 was to pay the Peoples Bank's mortgage, and $1,000 was for the use of the restaurant. Kennedy desired only to mortgage the restaurant, but the bank insisted upon a mortgage on the restaurant and on the real estate, and the bank took the two mortgages to secure the loan. A chattel mortgage on the restaurant and a mortgage on the real estate, both securing the same two notes, which the bank required to be signed by both Kennedy and his wife, covering the $1,500 loaned, and with the money so loaned $500

was paid to the Peoples Bank in cancellation of its mortgage, and the residue was given to the borrower, J. R. Kennedy, to use in his restaurant.

While the notes were signed by both husband and wife, the wife did not borrow the money, nor ask for it, and the loan was in truth and in fact to J. R. Kennedy, and the bank knew this fact and dealt with J. R. Kennedy personally, and Kennedy personally for a while paid the interest on this debt.

Mr. Henry Heyer, an attorney of the Wilmington bar, was selected to draw, and did draw, the papers and examine the title to the real estate for the bank, and with part of the funds loaned by the bank paid the Peoples Bank mortgage, though he claimed he was J. R. Kennedy's attorney in the matter and was paid by Kennedy. Mr. Levi Carter, of the Hanover Realty Company, went with Kennedy to make arrangements with the bank for this loan.

Some time afterwards Carter, for himself, the Hanover Realty Company, and one Max Meyers, made a trade with Kennedy for the purchase of the restaurant mortgaged to the bank, whereby Kennedy claims they were to pay him for the restaurant $2,500, $1,500 of which was paid to the bank in satisfaction of the notes secured by the chattel mortgage and the real estate mortgage, and the residue, $1,000, was to go and be applied as a credit toward the payment for the Lloyd place that Kennedy was to buy from the purchasers of the restaurant, and Kennedy was to give a second mortgage to the purchasers of the restaurant on the Lloyd place for an additional $1,000 of the purchase price of the Lloyd place, Kennedy to take the Lloyd place subject to a mortgage which was then on it, and which had been given by Carter and Meyers and the Hanover Realty Company. The second mortgage was to be due seven years after its date.

The terms of the two trades being agreed upon, Mr. Henry Heyer was called in by the parties to prepare the papers for the consummation of them, and in preparing the papers he asked: "Who is to pay the mortgage on the restaurant?" and was informed that Carter was to pay it. Heyer went to the defendant bank and asked them if they would cancel the mortgage upon the restaurant (certainly informing them why he asked the question), and upon being informed by the bank that it would not cancel the mortgage on the restaurant, he informed the bank that the restaurant was being sold, and told the bank that he would collect the money for the bank. Thereupon the bank agreed to cancel the mortgage and let Heyer collect it.

The restaurant was sold in accordance with the agreement that Carter was to pay the mortgage and Heyer to collect it, and the bank gave to Heyer the mortgage marked canceled, and Kennedy signed the bill of

sale conveying the restaurant, and delivered it to the purchasers, but before that part of the trade could be completed, and the title to the Lloyd place examined, Kennedy was called from the city to the bedside of his sick father, and the mortgages to be given by Kennedy for the balance of the purchase price for the Lloyd place were never executed and delivered, Kennedy claiming that Carter, Meyers, and the Hanover Realty Company would not let him have the papers, and Carter and Meyers claiming that they could not find Kennedy to deliver him the papers for execution.

The purchasers of the restaurant took possession of it, ran it for a while, and then sold it to one Sheppard, when Mr. Henry Heyer was again called in and drew the papers for its sale to Sheppard, knowing that the bank had not been paid, and that Carter had agreed to pay the bank's mortgage, and knowing that he had the bank's mortgage, either canceled or for collection, and that he had voluntarily promised to pay the bank the amount due under the Kennedy mortgage, and participated in the transaction whereby the restaurant was sold to Sheppard with a guarantee against encumbrances. The restaurant was the individual property of J. R. Kennedy, the real estate to secure J. R. Kennedy's debt was the property of husband and wife as tenants by entireties, the wife borrowing nothing from the bank and requesting nothing of it, but assenting to sign with her husband the notes and the mortgage on the real estate, and being therefore merely a surety.

At the second sale of the restaurant, which Mr. Heyer aided in making, the restaurant was sold for $1,500, the amount of the bank debt against Kennedy, after removal of part of the fixtures.

In the meantime, Heyer not having collected from Carter, or any other person, the money on the bank's mortgage, and being in no way liable to the bank for its debt, not having assumed it, the bank said something to him about collecting the amount of the chattel mortgage. Whereupon Heyer voluntarily gave the bank his personal guarantee in writing, with one George H. Hutaff, for the payment of the Kennedy chattel mortgage.

The court decided with the plaintiff, and granted the injunction. Defendant appealed.

*A. G. Ricaud* and *E. K. Bryan for plaintiff.*
*John D. Bellamy & Son for defendant.*

WALKER, J., after stating the case: It appears that, pending this suit, and at the request of the defendant bank, Henry Heyer, in pursuance of his guarantee to do so, paid the chattel mortgage, which, of course, discharged the debt secured by the real estate mortgage given

by Kennedy and his wife to the bank. There is no question of an inno-
cent holder in the case, as the bank was the original payee in the Ken-
nedy notes, and it, its agent, or Heyer, participated in all the trans-
actions mentioned, Heyer having actual knowledge and the bank perhaps
imputed knowledge of the facts.

The assignments of error, as to the admission of evidence, are without
merit.

As between the apparent makers and the original taker of the Kennedy
notes, it was competent for the plaintiff to prove which of the two
signing the notes to the bank was the principal debtor, and which was
the surety. *Welfare v. Thompson,* 83 N. C., 276; *Lockhart v. Ballard,*
113 N. C., 292; *Foster v. Davis,* 175 N. C., 541; *Williams v. Lewis,*
158 N. C., 571. Henry Heyer, for whom this suit is defended, and who
paid the notes signed by Kennedy and his wife, aided the transfer of
the property to Sheppard, and they being parties to that transaction, the
evidence objected to, which was the subject of the third assignment of
error, was competent.

The testimony, under the fourth assignment of error, was competent
as shedding light on the value of the personal property upon which the
bank held a chattel mortgage, and on the sale to the Hanover Realty
Company, to which the bank and Heyer both assented. Mrs. Kennedy,
and her real estate, were sureties of her husband, and the bank and
Heyer having appropriated the principal debtor's property, the surety,
and her land, were thereby exonerated, as they (the bank and Heyer)
virtually assented to the disposition of the principal's property securing
the debt upon which the wife was surety, and received the proceeds of
the sale, or the benefit thereof.

The evidence of the witness Ricaud, the subject of the fifth assign-
ment of error, was competent as showing the bank had knowledge of the
sale and transfer of the restaurant, and acquiesced in such sale, and,
further, as showing the bank had released the property covered by the
chattel mortgage.

While we have, in a summary way, considered defendant's exceptions
to testimony, it was only perfunctory, on our part, as we are of the
opinion that none of the exceptions were properly taken. It will be
observed by referring to the record that each of those covered by the
fifth assignment of error was entered to a mass of evidence, some of
which was surely competent. The exception must be good as to all the
evidence embraced by the objection. *S. v. Ledford,* 133 N. C., 714;
*Nance v. Tel. Co.,* 177 N. C., 313, where the cases, up to that time, are
collected; *Harris v. Harris,* 178 N. C., 7. The other exceptions are so
immaterial and inconsequential as to be utterly insufficient to induce a
reversal, if the questions were incompetent. We will repeat again that

verdicts and judgments should not be lightly set aside upon grounds, or for reasons, which show the alleged error to be harmless, or not injurious, in its results. There should be something like a practical treatment of the motion to reverse, and it should not be granted except to subserve the real ends of substantial justice; it should be meritorious and not frivolous. The foundation of the application for a new trial is the allegation of injustice, and the motion is for relief. Unless, therefore, some wrong has been suffered, there is nothing to be relieved against. The injury must be positive and tangible, not theoretical merely. For instance, the simple fact of defeat is, in one sense, injurious, for it wounds the feelings. But this alone is no sufficient ground for a new trial. It does not necessarily involve loss of any kind, and without loss, or the probability of loss, there can be no new trial. The complaining party asks for redress, for the restoration of rights which have first been infringed, and then taken away. There must be, then, a probability of repairing the injury, otherwise the interference of the Court would be but nugatory. There must be a reasonable prospect of placing the party who asks for a new trial in a better position than the one which he occupies by the verdict. If he obtains a new trial, he must incur additional expense, and if there is no corresponding benefit, he is still the sufferer. Besides, courts are instituted to enforce right, and restrain and punish wrong. Their time is too valuable for them to interpose their remedial power idly, and to no purpose. They will only interfere, therefore, where there is a prospect of ultimate benefit. *S. v. Smith,* 164 N. C., 475, 480, 481, and cases approving it which will be found in the Anno. Edition of that report; Hilliard on New Trials (2 ed.), sections 1 to 7; Graham & Waterman on New Trials, 1235. Tested by this safe and sound rule of the law, there is no reversible error in the exceptions so far considered.

The real pivotal question in this appeal is, whether Henry Heyer was entitled to be subrogated to the rights of the bank, provided the bank had any right to which the doctrine of subrogation applied. We do not think it had any such right, nor do we assent to the proposition that Henry Heyer had acquired such an equitable right by anything that he did, even if he were a party to this suit, and had properly pleaded or set up the same. Granted that he secured the money for Carter to pay for the personal property he had bought at the sale, that was only a favor or accommodation to Carter, and in no possible aspect could raise an equity in Heyer's behalf. This seems to be perfectly plain. But there are none of the elements of a subrogation, if Heyer had come in and been made a party, and sufficiently pleaded the same equity. He was a mere volunteer in the transaction, and the written guaranty which he gave to the bank does not change the result. It was still a voluntary

and gratuitous payment by him. It was more than voluntary, it was officious, in a legal sense, and he cannot appeal to equity for relief. This doctrine is well settled. *Joyner v. Reflector Co.,* 176 N. C., 274; *Publishing Co. v. Barber,* 165 N. C., 478; *Liles v. Rogers,* 113 N. C., 197. Legal subrogation arises, where one has an interest to protect, or is secondarily liable, and makes a payment. *Jones v. Reflector Co., supra.*

But another conclusive answer is, that in the beginning there was a written agreement that the money arising from the sale of the restaurant property should be applied in payment of the debt secured by both the chattel and real estate mortgages, which was $1,500, and that is all that has been done. If Mrs. Kennedy, the surety of her husband, must pay over that amount to Heyer, through the bank itself, or the bank as trustee, they will have received nothing for the restaurant property in the end.

"Conventional subrogation, so named from the covenant or agreement of the civil law, is founded upon the agreement of the parties which really amounts to an equitable assignment." *Joyner v. Reflector Co., supra.* Heyer was under no legal liability, nor moral obligation, to pay the debt, and the agreement referred to in the last quotation means an agreement made at the time of contracting liability, or an agreement entered into afterwards at the instance of the party liable. "A volunteer cannot acquire an equitable lien or the right of subrogation." *Publishing Co. v. Barber,* 165 N. C., 478, p. 487. On page 484 of the case last cited, the Court states that one can be subrogated only upon some special circumstance (meaning having some interest or right to protect), or by a payment on request from the debtor, raising an implied contract.

Mr. Heyer, in his testimony, upon which the defendant relies, states positively that Kennedy and his wife were not to pay the indebtedness to the bank, but that Carter was to pay it, and he in effect means to say that he gave the bank his guarantee because Carter had assumed the Kennedy debt; and, certainly, there can be no implied contract between Kennedy and his wife and Heyer, for the latter to pay the debt, as there is no express contract, and Heyer at that time had no interest of his own to protect.

The facts of all the transactions show that the bank or its attorney, if he be the bank's attorney, had knowledge of these sales and aiding in consummating them, and Mrs. Kennedy being a surety, and the plaintiff having proved that the personal property which her husband, the principal debtor, put up as security for the debt, has been sold and brought enough to pay it, and the bank and its attorney or guarantor having assented to the sale of the principal debtor's property, the sureties' property must be exonerated to the extent of discharging it from any

further liability. *Carriage Co. v. Dowd,* 155 N. C., 308, as the proceeds of the sale were sufficient to pay the whole debt.

This case is even stronger than the statement above made, for here we have the guarantor to the bank, Heyer, aiding and actively participating in the sale of the property of the principal debtor, who was primarily liable for the payment of the debt, and also assisting in its conversion, or wrongful disposition, and he now asks a court of equity, and conscience, to help him in this questionable conduct, by fastening the resultant loss upon the surety, who is innocent of all wrong, and to decree to the wrong-doer the property of such surety. If there is a legal or equitable rule justifying such a claim, we have failed to discover that it has found its way into the books.

No error.