C. L. BEAM v. R. W. WRIGHT AND MARY B. WRIGHT.

(Filed 29 November, 1944.)

**1. Bills and Notes §§ 25, 27—**

When plaintiff declares on a past-due negotiable note, regular in form, and offers evidence of its execution by defendants, a *prima facie* case is made out, which imposes upon defendants the burden of going forward with evidence to rebut the presumption created by the statute (G. S., 25-29), or incur the risk of an adverse verdict.

**2. Bills and Notes §§ 27, 29—**

Where plaintiff, in an action on a note for $5,976, introduced the note and offered evidence of its execution by defendants and evidence that defendants received full and valid consideration therefor, and defendants' evidence showing that the note was payable to plaintiff personally and was given solely to cover $800 in checks drawn by defendants on the bank of which plaintiff was an officer and the note was filled in for an unauthorized amount and used illegally by plaintiff to cover up his defalcation, and all the evidence showing that plaintiff's shortages have been fully paid by his bondsman, it was error for the court to instruct the jury to answer the issue as to defendants' liability on the note in the affirmative; while a motion to nonsuit was properly denied.

**3. Subrogation § 1—**

Legal subrogation is a device adopted by equity to compel the ultimate discharge of an obligation by him who, in good conscience, ought to pay it. It arises when one person has been compelled to pay a debt which ought to have been paid by another and for which the other was primarily liable. The application of this doctrine has been expanded beyond matters of strict suretyship or priorities and is called into operation by a variety of circumstances.

**4. Subrogation § 2—**

It is generally held that the equitable relief of subrogation will be withheld from those who are themselves guilty of wrongful conduct with respect to the transaction in which it is invoked. One who is a mere volunteer, or who is guilty of fraud in bringing about the situation wherein he seeks the aid of equity, will not be permitted to avail himself of relief by the doctrine of subrogation. It will not be applied to a tortious transaction at the instance of the tort-feasor, nor enforced in a doubtful case when the rights are not clear.

BARNHILL, J., dissenting.

WINBORNE, J., concurs in dissent.

APPEAL by defendants from *Hamilton, Special Judge,* at November Term, 1944, of CARTERET.

This was an action to recover on a note in the sum of $5,976. Defendants denied liability and pleaded want of consideration.

This case was here at Fall Term, 1942, and is reported in 222 N. C., 174, 22 S. E. (2d), 270. That appeal involved only the pleadings. On the trial below compulsory reference was ordered and both parties excepted. The referee found the defendants liable on the note sued on in the sum of $800, and plaintiff filed exceptions to the report with demand for jury trial upon issues tendered. The issues tendered and submitted to the jury on the trial were these:

"1. Are the defendants indebted to plaintiff by virtue of their promissory note, as alleged in the complaint?

"2. If so, in what sum?"

The jury answered the first issue yes, and the second issue $5,976. From judgment on the verdict defendants appealed.

*A. L. Hamilton, C. R. Wheatley, and R. A. Nunn for plaintiff.*
*R. E. Whitehurst and L. I. Moore for defendants.*

DEVIN, J. The plaintiff declared upon a past-due negotiable note, regular in form, and offered evidence of its execution by the defendants. This made out a *prima facie* case, and imposed upon the defendants the burden of going forward with evidence to rebut the presumption created by the statute (G. S., 25-29), or incur the risk of an adverse verdict. *Stein v. Levins,* 205 N. C., 302, 171 S. E., 96; *Benner v. Phipps,* 214 N. C., 14, 197 S. E., 549. In accord with this rule the plaintiff, having introduced the note in evidence, rested his case.

The defendants admitted signing the note sued on, but testified they signed it at the instance of the plaintiff who was then cashier of the bank with which they had been dealing; that when they signed the note the amount was left blank; that they were induced to sign it in that form by the insistence of the plaintiff that he needed it on account of an expected bank examination, and that it would be filled in with the comparatively small amount of checks of defendants which had been paid and held out from entry by the bank. Defendants testified the plaintiff paid nothing to them or to the bank; that all of defendants' antecedent obligations to the bank had been paid.

The transactions between plaintiff and defendants and the bank are detailed in the record, but much of this is not material to the questions presented by this appeal. However, it appears that defendants were borrowers from the bank, and that the bank in addition through its cashier, the plaintiff, had indulged the practice of paying defendants' checks drawn on the bank when they had insufficient deposits or credit therein, and holding out the checks in the bank until the defendants should execute notes to the bank to cover.

The plaintiff's contention was that in August, 1940, the defendants' unpaid notes given to cover held out checks, together with additional checks which had since been paid by the bank, had accumulated until they aggregated $5,976, and that at plaintiff's suggestion the defendants signed the note in suit in that sum, payable not to the bank but to him individually, to cover same. The plaintiff admits he paid nothing to the defendants or to the bank, but he contends that, having been subsequently found short in his accounts with the bank and convicted or pleaded guilty in the United States District Court, the surety on his. fidelity bond paid to the bank the amount of his shortage which grew out of the Wright checks, and that he has agreed to reimburse the Surety Company, and is doing so by monthly payments secured by mortgage on his home. He contends that the amount for which the defendants were liable to the bank, being the same amount designated in the note, was paid by the Surety Company to the bank; that this was in discharge of the liability of the defendants, and that his, the plaintiff's, repayment to the Surety Company of this debt, which was primarily the obligation of the defendants, entitled him to be given now the status of having furnished the full consideration for the defendants' note. In other words, he contends that the consideration for the note in suit was his agreement to pay the defendants' debt to the bank; that while he did not do so at the time, he has now done so, and the full benefit agreed has inured to the defendants, and the full payment has been made by him. 10 C. J. S., 616; *Turner v. Rogers,* 121 Mass., 12; Restatement Law Contracts, sec. 75, p. 83.

It also appeared in evidence that while the transactions about the notes and held out checks were being carried on between the defendants and the bank, the plaintiff Beam was manipulating certain deposit accounts in the bank in order to cover the shortages occasioned by holding out Wright's checks; that he unlawfully took funds from the accounts of other depositors to make good these shortages, and falsified and concealed entries on the books of the bank in violation of law.

It will be noted that whatever debt defendants owed at the time was to the bank and not to the plaintiff, and that, for some reason, he had the note executed in his own name, with the agreement, as he contends, as consideration therefor that he would pay to the bank the amount designated in the note in settlement of defendants' debts to the bank.

Considering the evidence in the light of the plaintiff's contentions, the rather unusual situation shown by the record may be diagrammed like this: A being indebted to B, executes note to C upon the latter's promise to pay B. C does not himself pay the debt, but wrongfully takes money from D and pays B. Upon discovery, B returns the money to D, and thereupon E, the surety on C's bond, reimburses B, and C agrees to

reimburse E. Whereupon C sues A on the note, on the ground that consideration is now shown.

The defendants, on the other hand, offered evidence tending to show that all their notes and obligations to the bank had been paid prior to the execution of this note, and that it was only in consequence of the representations of plaintiff Beam that there were some additional checks held out, amounting to $700 or $800, and that he wished them to sign a note in order to tide him over a bank examination, that they were induced to sign the note in blank.

The defendants contend that they owe Beam nothing and never have; that Beam never paid anything to them or to the bank; that they had no transactions with Beam personally, only with the bank through him, and that the note sued on was entirely without consideration; that plaintiff's misapplication of the bank's funds began prior to the defendants' dealings with the bank, and were not connected with defendants' checks. Defendants further assert they had no knowledge that Beam was taking funds from other depositors to cover his shortages. They contend that the note being without consideration at the time of its execution, plaintiff should not now, out of circumstances showing the wrongful taking of the property of others to cover his own defalcations, be permitted to invoke an equity which would inure to his own benefit, and by this circuitous method give life to a note void for lack of consideration. The defendants also call attention to evidence that after the discovery of plaintiff's defalcation and his prosecution he offered the note now in suit to the bank and also to the Surety Company, but neither would accept it. Neither claimed any interest in it.

The defendants noted exception to the court's instruction to the jury that "under all this evidence" they should answer the first issue yes, and that they should not concern themselves with any investigation as to whether the defendants were indebted, but should consider only the second issue as to the amount.

The question in the first issue was whether the defendants were "indebted to the plaintiff by virtue of the promissory note sued on." The defendants did not deny that there were at the time of the execution of the note to plaintiff in the bank some "held out" checks which would have constituted an overdraft, but we do not understand the defendants admitted the validity of the note sued on, or their indebtedness to the plaintiff Beam thereon. This being so, their defenses that they had paid their notes and obligations to the bank, that they owed Beam nothing, that the note was without consideration and obtained for an illegal purpose (7 Am. Jur., 965), were disregarded, as was also their contention that the circumstances negatived the application of the equitable principle of subrogation in aid of a wrongdoer, and failed to

afford ground for the maintenance of a suit on this note against these defendants.

We think this assignment of error well grounded, and that the instruction to which exception was noted must be held for error. At the time it was given the note was *nudum pactum.* There was then no legal obligation on the defendants to pay Beam. The circumstances relied upon by the plaintiff to show he had eventually paid, through the Surety Company, a debt which was primarily the obligation of the defendants, are not admitted. The defendants' view is that the note was procured by the plaintiff to aid him in perpetrating a fraud on his employer and to cover up his violations of law, and that these fraudulent transactions were in no way related to the defendants' overdrafts, either in time or amount. From the defendants' standpoint and in accord with their testimony, the plaintiff's wrongful conduct was such as to deprive him of the benefit of his repayment to the Surety Company, under the principle of subrogation, for the purpose of supplying evidence of consideration for the note sued on.

We think the defendants were entitled to have this phase of the case considered by the jury on the first issue. Forced repayment by plaintiff to the Surety Company of a debt for which defendants were primarily liable would seem to entitle him to be put in the shoes of the Surety Company and to succeed to its rights if he could follow or trace the fund and show that the debt he repaid to the Surety Company, and through it to the bank, was the same debt which defendants owed to the bank. But on this point the defendants' evidence is at odds with that of the plaintiff.

In view of these conflicting claims and the evidence in support thereof we think the defendants' motion for judgment of nonsuit was properly denied. While the defendants contend the entire transaction is so tainted with illegality that no action on a note growing out of it can be maintained, we think consideration of the plaintiff's evidence in the light most favorable for him presents a different view, at least entitling him to go to the jury.

The plaintiff testified the Wrights owed the amount of the note at the time of its execution, and that the figures $5,976 were discussed with them, and that nothing had been paid thereon. According to his testimony the antecedent transactions leading up to the execution of the note were these: The defendants were large truck growers, at times needing considerable sums of money, and were borrowers of the bank. Numerous notes and renewals were given by defendants beginning in 1938. In addition the defendants' checks were honored and held out in the bank until notes could be given to cover same. The last of these notes was one for $4,700. "At that time he actually owed the bank approximately

that amount of money. The nature of it was items I had held for Mr. Wright—checks." Subsequently other checks were cashed and on 25 August, 1940, the aggregate was $5,976, for which the note sued on in that amount was given. "The $5,976 is made up of the $4,700 note and additional checks which I had cashed for Mr. Wright between the time the $4,700 note was discounted and the $5,976 note was given. Mr. Wright would come to me saying how much money he needed and how badly he needed it. He said that Mrs. Wright was in the hospital and he was trying to clear new ground and needed money to' pay hospital and other bills. I advanced him the money up to $5,976, and that is what goes to make up the $5,976 note. No part of that note has been paid. I gave Mr. Wright the $4,700 note when I received the $5,976 note. I think I stamped it paid. At the time the $5,976 note was given I felt that Mr. Wright was not going to get a note discounted to take care of those items, and I made the note payable to myself because I knew that I or the bonding company would have to reimburse the bank for the money I had let Mr. Wright have, I might say illegally. I had not been authorized to make this loan. The bonding company has reimbursed the bank and to secure the bonding company I gave a mortgage on my house. I am now paying the bonding company $50.00 per month."

He testified that at the time of the execution of the $5,976 note, in addition to delivery of the $4,700 note marked paid, Wright received the checks back. "The checks I gave back were those that came to the bank on Mr. Wright that I cashed, approximately $1,200."

Plaintiff admitted that in order to cover the shortage occasioned by cashing Wright's checks he manipulated other accounts in the bank, and that he pleaded guilty to making false entries, but he contends that for his wrongdoing in this respect Wright got the benefit, while he has had to pay the penalty imposed by the law; that to deny him recovery on the note would permit Wright to escape the payment of a just debt for which the plaintiff has paid in full.

According to plaintiff's evidence the only illegality in these transactions consisted not in the consideration of the note nor in its execution, but in the means employed to provide the funds to loan to Wright, and that Wright having received the money is justly indebted therefor; that plaintiff profited nothing by these transactions, but on the other hand has paid or is paying the full amount of Wright's debt, $5,976.

In this connection it will be noted that in the case of Covington v. Threadgill, 88 N. C., 186, which was a suit on a note given for intoxicating liquor in violation of the express provisions of the statute then in force, it was said the sale of liquor by plaintiff to the defendant in that case was illegal, and "being thus illegal, so that no action in affirm-

ance of it can be maintained by the court, it taints and violates any contract into which it enters or forms any part of the consideration." It might be argued, however, that if plaintiff in that case had loaned the defendant money, though plaintiff had derived it from the sale of liquor to others, the principle stated in the opinion would not have prevented recovery of the debt, the vitiating influence of tainted money not going that far.

Now, on the other hand, the defendants say the facts are entirely different; that the $4,700 note was paid by defendants in cash; that at the time of the execution of the note sued on the held out checks did not amount to more than $800; that Beam's shortage in the bank was $7,600, and this was in no way related to defendants' transaction with the bank; that the note sued on was signed in blank and given for an unlawful purpose to cover plaintiff's own defalcation; that the note was without consideration, and that the consideration and the entire transaction on which he bases his suit were tainted with fraud and illegality.

The decision of these conflicting claims was for the jury.

It will be borne in mind that the plaintiff does not ground his action on subrogation. He sues at law on a promissory note. However, when absence of present consideration for the note appears, he avails himself of the aid of equity and offers evidence to show that he was compelled to and did pay the debt which was the consideration for the note, not directly, but indirectly through the Surety Company, and in discharge of the primary liability of the defendants therefor; and that, in accord with the principle of subrogation, his reimbursement of the Surety Company constitutes consideration to support the note. The defendants controvert the evidence upon which this conclusion rests, and thus the application of the equitable principles involved depends upon the determination of the disputed facts.

Legal subrogation, as distinguished from conventional subrogation, is a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it. It arises when one person has been compelled to pay a debt which ought to have been paid by another and for which the other was primarily liable. *Trust Co. v. Godwin,* 190 N. C., 512, 130 S. E., 323; *Grantham v. Nunn,* 187 N. C., 394, 121 S. E., 662; 50 Am. Jur., 678; 60 C. J., 705; Pom. Eq., 5th Ed., sec. 1419; Sheldon on Subrogation 4; 3105 *Grand Corp. v. New York,* 288 N. Y., 178, 141 A. L. R., 1211. The application of this doctrine has been expanded beyond matters of strict suretyship or priorities, and is called into operation by a variety of circumstances. *Burgoon v. Lavezzo,* 92 F. (2), 726, 113 A. L. R., 944. The equity of subrogation and the different situations in which it has been made available as an aid to justice have been considered in numerous cases by this Court.

*Boney, Ins. Comr., v. Ins. Co.,* 213 N. C., 563, 197 S. E., 122; *Wallace v. Benner,* 200 N. C., 124 (132), 156 S. E., 795; *Morris v. Cleve,* 197 N. C., 253, 148 S. E., 253; *Jeffreys v. Hocutt,* 195 N. C., 339, 142 S. E., 226; *Everett v. Staton,* 192 N. C., 216, 134 S. E., 492; *Trust Co. v. Godwin,* 190 N. C., 512, 130 S. E., 323; *Grantham v. Nunn,* 187 N. C., 394, 121 S. E., 662; *Caldwell v. Robinson,* 179 N. C., 518, 103 S. E., 75; *Brown v. Harding,* 170 N. C., 253, 86 S. E., 1010; *Pub. Co. v. Barber,* 165 N. C., 478, 81 S. E., 694; *Moring v. Privott,* 146 N. C., 558, 60 S. E., 509; *Liles v. Rogers,* 113 N. C., 197, 18 S. E., 104.

However, it is generally held that equitable relief on this ground will be withheld from those who are themselves guilty of wrongful conduct with respect to the transaction in which it is invoked. One who is a mere volunteer, or who is guilty of fraud in bringing about the situation wherein he seeks the aid of equity, will not be permitted to avail himself of the relief afforded by the doctrine of subrogation. *Wallace v. Benner,* 200 N. C., 124, 156 S. E., 795; 50 Am. Jur., 694-707, 4 A. L. R., 44 (annotation). It will not be applied to a tortious transaction at the instance of a tort-feasor, nor enforced in a doubtful case when the rights are not clear. 60 C. J., 702. "One who wrongfully appropriates the property of another for his own use will not receive the aid of a court of equity in any matter with which such reprehensible conduct is connected." Pom. Eq., 5th Ed., sec. 401, 4 A. L. R., 54; *Union Central L. Ins. Co. v. Drake,* 214 Fed., 536 (542); *Keystone Driller Co. v. General Excavator Co.,* 290 U. S., 240.

Without undertaking to explore all the ramifications of the principles of this equity or to define the extent of any application of these principles to the contrasting phases of the testimony in this case, we think the determination of the question of consideration and the ultimate liability of the defendants on the note in suit depends on the proper decision of the underlying and controlling facts relating to the first issue.

For the reasons given we conclude that the defendants are entitled to a new trial, and it is so ordered.

New trial.

BARNHILL, J., dissenting: On the motion to nonsuit, considering the evidence in accord with the controlling rule, these facts stand out:

1. Plaintiff was cashier of the Beaufort branch of the First-Citizens Bank & Trust Company. Over a period of time he, with the approval of the proper bank officials, had made loans to the defendants. He also from time to time paid checks of the defendants when they had no credit balance in the bank. He did not charge these to the defendants' account so as to show an overdraft but carried them as "cash items" and they are referred to in the record as "throw-out" checks. The transactions

in respect to the checks were had without the knowledge of plaintiff's superiors.

2. On 28 February, 1940, defendants had in the bank two notes, one for $1,500 and one for $2,250. The bank also held several hundred dollars of "throw-out" checks. On that date they executed and delivered to the bank their note for $4,700. The proceeds of this note were credited to their account. A few days later their account was charged with the outstanding items, including the two smaller notes or checks therefor, leaving a credit of $6.25.

3. On 26 May, 1940, plaintiff entered a credit of $3,000 on the $4,700 note. This credit is reflected on the books of the bank. No payment was in fact made. To "cover up" and conceal this false entry, plaintiff juggled and misapplied other assets of the bank. On 3 July, 1940, he entered another credit of $1,700. This was concealed on the books of the bank in the same manner by misappropriation of other assets. He then abstracted and embezzled the $4,700 note which, according to the records of the bank, had been, but was not in fact, paid.

4. On 25 August, 1940, plaintiff had in his possession this embezzled note. At that time the bank had paid and was holding "throw-out" checks of the defendants totaling $800 or more. Plaintiff demanded a note in renewal of these combined items. Thereupon, the note sued upon was executed, the consideration thereof being the embezzled note and the "throw-out" checks. The $4,700 note was canceled and delivered to defendants.

5. Plaintiff admits that he furnished no part of the consideration of the note and that it represents the consolidated items—the "throw-out" checks and the $4,700 note. He testified: "At the time the $5,976 note was given, I felt that Mr. Wright was not going to get a note discounted to take care of those items and I made the note payable to myself because I knew that I or the bonding company would have to reimburse the bank for the money I had let Mr. Wright have, I might say illegally."

So then plaintiff's case comes to this. Being in possession of a note unlawfully abstracted from the assets of the bank and having allowed defendants to overdraw their account, he demands and accepts a note in renewal of these items. He now sues on the note thus received to recover the amount thereof.

Will the courts aid him in his effort to convert the fruits of his embezzlement into cash and thus to reap the benefits of his unlawful conduct? In my opinion the answer should be no. Certainly this should be true as to so much of his demand as is represented by the $4,700 note. A somewhat different situation arises as to the checks.

It is argued that the note offered in evidence constituted *prima facie* evidence of the indebtedness and therefore the motion to dismiss as in

case of nonsuit cannot be sustained. But we must remember that we are considering the motion last made after plaintiff admitted he furnished no part of the consideration and had disclosed the real nature of the transaction.

When the note was offered in evidence, the signatures of defendants were not proven. Hence, the unidentified note constituted no evidence. But, passing that question, when the plaintiff went on the stand and testified, he disclosed the illegal nature of the consideration and rebutted the *prima facie* effect of the note itself as effectively as if he had then admitted that the note had been paid in full.

The court will not become a party to the enforcement of an illegal contract or a contract based on an unlawful consideration, 2 Pom. Eq. Jur. (5th), 117; 3 Pom. Eq. Jur. (5th), 645, or one which is against public policy, 3 Pom. Eq. Jur. (5th), 652, or opposed to good morals, *ibid.,* 714. The proposition is universal that no action arises, in equity or at law, from an illegal contract. *Ibid.,* 728; *Covington v. Threadgill,* 88 N. C., 186; *Fashion Co. v. Grant,* 165 N. C., 453.

"The Court will permit nothing to be done which will enable a party to collect from the other the fruits of his wrong. When he sues to recover, the law will not give him judgment." *Basket v. Moss,* 115 N. C., 448 (459); *Pierce v. Cobb,* 161 N. C., 300; *Tobacco Association v. Bland,* 187 N. C., 356; *Waggoner v. Publishing Co.,* 190 N. C., 829; *Merrell v. Stuart,* 220 N. C., 326.

The note in controversy is nothing more than a link in the chain of illegal transactions of plaintiff in misapplying and misusing the funds of the bank. Now that his misappropriations have been disclosed, he seeks to preserve his ill-gotten gains by recovering from defendants.

On his own testimony the whole transaction is steeped in fraud and illegality. The conclusion that he is now attempting to preserve the fruits of his unlawful conduct by recovering on a transaction which was illegal in its inception is inescapable. If he is permitted to do so, he will profit by his own wrong. In my opinion the court should decline to entertain his action, certainly to the extent the note represents the amount due or alleged to be due on the embezzled obligation of defendants.

But plaintiff contends that in any event he should be permitted to recover under the doctrine of subrogation; that his surety reimbursed the bank for the losses resulting from his defalcations; and that he has secured and is now repaying in monthly installments the amount thus expended by the surety company.

The uncontroverted evidence is to the effect that the bonding company made settlement on the basis of a statement of shortages furnished by the bank auditor, and this statement shows that the $4,700 note was not

included. In fact, plaintiff's shortage in large measure resulted from the misapplication of a $5,000 check. His misuse of assets of the bank is related to the $4,700 item in this manner: he took certain other assets and used them to acquire the obligation of defendants. In the settlement the surety paid the loss resulting from the original abstractions.

These facts do not invoke the application of the doctrine of subrogation even though the shortage arising out of the misappropriation of the note was a part of the settlement made by the surety company. The debt the surety company paid was the debt of the plaintiff. In reimbursing the surety company, plaintiff is paying his own debt and not the debt of the defendants. On his own admissions, he has no interest in the note sued upon and his payment to the surety company creates no right of subrogation.

It may be that the Wrights are indebted to the bank, or, perhaps, by subrogation, to the surety company. But the fact that neither the bank nor the surety company will sue is insufficient to vest in plaintiff the right to do so.

Even if we concede that in paying the surety company plaintiff is discharging an obligation on which defendants are primarily liable, he cannot resort to the equitable doctrine of subrogation. Whatever interest he has in the subject matter of this action, either direct or by subrogation, is traceable directly to his unlawful misuse and misapplication of funds of the bank which had been entrusted to his care. It is impossible to divorce the consideration of the note from its illegal inception. 12 Am. Jur., 646, sec. 152.

"He who comes into equity must come with clean hands" is a maxim so universally recognized and applied that no citation or authority is required.

"The Courts will not paddle in muddy water, but in such cases the parties are remitted to their own folly." *Waggoner v. Publishing Co.*, *supra; Merrell v. Stuart, supra.*

Now I come to the "throw-out" checks which under the testimony of all parties form a part of the consideration of the note. The only dispute as to these items relates to the amount. But what became of them after the note of 25 August was executed remains, on this record, somewhat a mystery. They were not charged to the account of the defendants. It is not shown affirmatively that plaintiff paid the bank the sum expended in honoring them. They did not remain in the bank. But it does not appear that they were delivered either to plaintiff or to defendants.

When plaintiff honored these checks he became personally liable thereon. G. S., 53-89. If he in fact discharged this obligation in good faith out of his own funds and not by juggling accounts and entries, it

may seem to be a hardship to deny him a recovery. But he has elected to combine the legal with the illegal and immoral as the consideration of a new promise upon which he now seeks recovery. The court will not entertain the suit for the purpose of undertaking to separate the good from the bad. Instead it will leave him where his wrongful or illegal conduct has placed him.

As observed by *Lord Chief Justice Wilmot,* "No polluted hand shall touch the pure fountain of justice; and those so entering the temple will be expelled with the anathema *'Procul, O procul este, profani.'* " See *Rock v. Mathews,* 35 W. Va., 531.

"No principle is better settled than this: That if a single contract be made on several considerations, any one of which is illegal, then the whole promise is void, because every part thereof is induced and therefore affected by the illegal consideration." *Covington v. Threadgill,* 88 N. C., 186; *Wittkowsky v. Baruch;* 127 N. C., 313 (318).

For the reasons stated, I vote to reverse.

WINBORNE, J., concurs in dissent.