**N.C. INSURANCE GUARANTY ASSN. v. CENTURY INDEMNITY CO.**

[115 N.C. App. 175 (1994)]

NORTH CAROLINA INSURANCE GUARANTY ASSOCIATION, Plaintiff v. CENTURY
INDEMNITY COMPANY, Defendant

No. 9310SC677

(Filed 21 June 1994)

1. **Insurance § 43 (NCI4th)— automobile accident—primary insurer insolvent—commercial umbrella policy not required to drop down**

The trial court properly granted summary judgment for defendant where a suit was filed against Long Manufacturing as a result of an automobile accident; Long was insured by AMLIC under a comprehensive general liability policy and by Century under a commercial umbrella liability policy; AMLIC was declared insolvent; a dispute developed between the Insurance Guaranty Association and Century as to whether Century's commercial umbrella policy was required to drop down and become primary; a settlement was reached in the underlying case to which both the Association and Century contributed; the Association filed a complaint against Century seeking recovery of the amounts it had expended; Century counterclaimed for the difference between the amount the Association had paid and its statutory coverage limit, that sum being less than Century had contributed to the settlement; and the trial court entered summary judgment for Century. Century's commercial umbrella policy was clear and unambiguous. Interpreting the policy's coverage agreements as written and according to their plain meaning, the phrase "amount recoverable" does not mean the amount actually recoverable and collectible from the primary insurer; that interpretation would render language on underlying limits meaningless, and it is assumed that the parties to insurance contracts do not create meaningless provisions. The loss payable condition in the contract serves to reinforce the coverage agreement by making it clear that a loss arising from an occurrence is not payable by Century unless the limit of the underlying insurance is exhausted by payment. The fundamental purpose of excess insurance is to protect the insured against excess liability claims, not to insure against the underlying insurer's insolvency.

**Am Jur 2d, Insurance § 874.**

2. **Insurance § 963 (NCI4th)— auto accident—insolvent primary insurer—Insurance Guaranty Association and umbrella insurer—equitable subrogation**

The trial court did not err by granting summary judgment for defendant Century on its counterclaim where Century was a commercial umbrella insurer; the insured's primary insurer became insolvent; there was a claim as a result of an automobile accident; there was a dispute between the Insurance Guaranty Association and Century as to which would provide primary coverage; the underlying action was settled, with both the Association and Century contributing; the Association filed an action against Century for the amounts it had expended; and Century counterclaimed against the Association for the difference between the Association's contribution to the settlement and its statutory limits. The determinative factor in assessing whether a party presents a valid claim of equitable subrogation is whether that party acted in good faith in seeking to protect its interests. Century reasonably acted to protect its own interest and acted in good faith; absent a statutory prohibition, Century is entitled to recover from the Association the statutory limits of the Association's coverage under the doctrine of equitable subrogation.

**Am Jur 2d, Insurance §§ 2051 et seq.**

3. **Insurance § 42 (NCI4th)— auto accident—insolvent primary insurer—Insurance Guaranty Association and umbrella insurer—equitable subrogation—"claimant" and "covered claim"**

There was no statutory prohibition against recovery by a commercial umbrella insurer against the Insurance Guaranty Association on the grounds of equitable subrogation where Century was the umbrella insurer; the primary insurer became insolvent; the Insurance Guaranty Association and Century could not agree on which was to provide primary coverage; the underlying action arising from an auto accident was settled; both the Association and Century contributed to the settlement; the Association brought an action for the amounts it had paid; Century counterclaimed for the difference between the Association's contribution to the settlement and its statutory limits; and summary judgment was granted for Century. Although the Association argued that Century's claim was barred by statutory language defining "covered claim" as excluding amounts due as subrogation or otherwise, the General Assembly did not intend for the

term "subrogation" to encompass equitable subrogation, particularly in a context in which the Association failed to fulfill its statutory obligation. Finally, the Association's interpretation is inconsistent with the goal of timely proper payments of legitimate claims and could encourage arbitrary and capricious settlement offers, leaving excess insurers with no remedy. N.C.G.S. § 58-48-5; N.C.G.S. § 58-48-20(4).

**Am Jur 2d, Insurance § 874.**

Appeal by plaintiff from judgment entered 22 April 1993 by Judge Narley L. Cashwell in Wake County Superior Court. Heard in the Court of Appeals 10 March 1994.

North Carolina Insurance Guaranty Association (hereinafter "plaintiff-Association") is an unincorporated legal entity established pursuant to the North Carolina Insurance Guaranty Act (hereinafter "the Act"), G.S. 58-48-1 *et seq.* Under the Act, the maximum amount which may be paid by plaintiff-Association in the event of an insurer's insolvency is $300,000.00 (hereinafter "statutory cap"). G.S. 58-48-35(a)(1). Defendant Century Indemnity Company (hereinafter "defendant-Century") is a Connecticut corporation licensed and admitted to transact insurance business in North Carolina and writing policies of insurance in North Carolina.

As the result of an 8 June 1985 automobile accident, William Brooks and Betty Brooks (hereinafter "the Brooks") filed suit against Long Manufacturing N.C., Inc. (hereinafter "Long"), American Mutual Liability Insurance Company's (hereinafter "AMLIC") insured, in a Texas court on 19 September 1985. During this time, two policies issued to Long were in effect: (1) AMLIC insured Long under a comprehensive general liability insurance policy with limits of $1,000,000.00, and (2) defendant-Century insured Long under a commercial "umbrella liability policy" with limits of $5,000,000.00. AMLIC was an insurer admitted and licensed to transact insurance business in North Carolina and wrote policies of insurance in North Carolina until 9 March 1989, when AMLIC was declared insolvent by a Massachusetts court.

After plaintiff-Association was activated pursuant to the Act as a result of AMLIC's insolvency, a dispute developed between plaintiff-Association and defendant-Century as to whether defendant-Century's commercial umbrella policy (issued to Long) was required to "drop-down" and become primary liability insurance for Long as a

result of AMLIC's insolvency. By letter dated 10 April 1989, plaintiff-Association demanded that defendant-Century provide Long with a defense and indemnify Long for any judgment or settlement arising from the Brooks' lawsuit. By letter dated 20 April 1989, defendant-Century denied plaintiff-Association's demand. By letter dated 5 May 1989, plaintiff-Association, while reserving its rights, agreed to pay Long's defense costs through trial.

On 17 August 1989, a settlement was reached in the underlying action; the Brooks received a payment of $400,000.00 in full settlement of all their claims against Long. Defendant-Century advanced $200,000.00 to the Brooks, while plaintiff-Association paid the remaining $200,000.00 to Long and its attorneys, subject to a reservation of rights, for disbursement to the Brooks. Long then executed a proof of claim assigning to plaintiff-Association all rights of action that it (Long) had against AMLIC or defendant-Century to the extent of any payment made to or on behalf of Long.

On 17 April 1991, plaintiff-Association filed a complaint against defendant-Century, seeking recovery of the $200,000.00 paid in the settlement plus $59,249.00 expended in plaintiff-Association's defense of Long in the underlying action. Defendant-Century filed an answer and counterclaim, seeking $100,000.00, an amount which represented the $300,000.00 statutory cap, G.S. 58-48-35(a)(1), of plaintiff-Association's obligation minus the $200,000.00 previously advanced by plaintiff-Association to Long to settle the Brooks' lawsuit.

In November 1992, plaintiff-Association and defendant-Century each moved for summary judgment. After a hearing, the trial court entered a 22 April 1993 order finding that "defendant[-Century] is entitled to judgment as a matter of law declaring that its policy of excess liability insurance is not required to 'drop down' and become primary liability insurance with respect to the underlying action; that defendant did not breach its contract with plaintiff and is not obligated to indemnify plaintiff for damages, prejudgment interest, defense or other costs or expenses in the underlying action; and that defendant is entitled to recover from plaintiff the sum of $100,000.00 on defendant's counterclaim." Plaintiff-Association appeals.

*Moore & Van Allen, by Joseph W. Eason, Christopher J. Blake, & Louis S. Watson, Jr., for plaintiff-appellant.*

*Cranfill, Sumner & Hartzog, by Robert W. Sumner and Susan K. Burkhart, for defendant-appellee.*

EAGLES, JUDGE.

Plaintiff-Association brings forth two assignments of error. After careful review, we affirm.

## I.

[1] The first issue presented by plaintiff-Association is whether defendant-Century's commercial umbrella policy must "drop down" and serve as primary insurance as a result of the insolvency of Long's primary liability carrier (AMLIC). *See* Annotation, "Primary Insurer's Solvency as Affecting Excess Insurer's Liability," 85 ALR 4th 729, 734 n.4 (1991) ("Drop down coverage occurs when an insurance carrier of a higher level of coverage is obligated to provide the coverage that the carrier of the immediately underlying level of coverage had agreed to provide"). At stake is defendant-Century's liability to plaintiff-Association for the $200,000.00 that plaintiff-Association paid in settlement of the Brooks' lawsuit.

In urging the reversal of the trial court's order, plaintiff-Association argues that the trial court erred because the language of defendant-Century's commercial umbrella policy requires it to "drop down" and provide primary coverage to Long. Plaintiff-Association contends that: 1) defendant-Century is required to drop down because the amount recoverable from the underlying insurance is zero; 2) the loss payable condition further supports defendant-Century's obligation to drop down; 3) the occurrence requiring coverage by defendant-Century is the accident in the underlying action, and; 4) because defendant-Century was obligated to drop down, defendant-Century must also pay the costs incurred by plaintiff-Association in defending Long in the underlying action.

There are several well established principles governing the construction of insurance policies. "In North Carolina, it is well settled that when construing an insurance policy a court must enforce the policy as written, 'without rewriting the contract or disregarding the express language used.'" *Newton v. United States Fire Ins. Co.*, 98 N.C. App. 619, 623, 391 S.E.2d 837, 839, *disc. review denied*, 327 N.C. 637, 399 S.E.2d 329 (1990) (quoting *Fidelity Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986)); *Industrial Center v. Liability Co.*, 271 N.C. 158, 155 S.E.2d 501 (1967). "'[R]esolution of [an insurance policy's scope] involves construing the language of the coverage . . . and determining whether events as alleged in the pleadings and papers before the court are covered by the poli-

cies. As such, it is an appropriate subject for summary judgment.' " *C. D. Spangler Constr. Co. v. Indus. Crankshaft & Eng. Co.*, 326 N.C. 133, 141, 388 S.E.2d 557, 562 (1990) (alterations in original) (*quoting Waste Management of Carolinas, Inc. v. Peerless Insurance Co.*, 315 N.C. 688, 691, 340 S.E.2d 374, 377 (1986)). Regarding the construction of policy language containing allegedly ambiguous terms, our Supreme Court has stated:

> Any ambiguity in the policy language must be resolved against the insurance company and in favor of the insured. *Woods*, 295 N.C. at 506, 246 S.E.2d at 777. A difference of judicial opinion regarding proper construction of policy language is some evidence calling for application of this rule. *See Maddox v. Insurance Co.*, 303 N.C. 648, 654, 280 S.E.2d 907, 910 (1981); *Electric Co. v. Insurance Co.*, 229 N.C. 518, 521, 50 S.E.2d 295, 297 (1948); Annot., "Insurance—Ambiguity—Split Court Opinions," 4 A.L.R. 4th 1253, 1255 (1981). While "[t]he fact that a dispute has arisen as to the parties' interpretation of the contract is some indication that the language of the contract is at best, ambiguous," *St. Paul Fire & Marine Ins. Co. v. Freeman-White Assoc., Inc.*, 322 N.C. 77, 83, 366 S.E.2d 480, 484 (1988); *accord Mazza v. Medical Mut. Ins. Co.*, 311 N.C. 621, 630, 319 S.E.2d 217, 223 (1984), "ambiguity . . . is not established by the mere fact that the plaintiff makes a claim based upon a construction of its language which the company asserts is not its meaning." *Trust Co. v. Insurance Co.*, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970).

> "All parts of a contract are to be given effect if possible. It is presumed that each part of the contract means something." *Bolton Corp. v. T.A. Loving Co.*, 317 N.C. 623, 628, 347 S.E.2d 369, 372 (1986). *See also Williams v. Insurance Co.*, 269 N.C. 235, 240, 152 S.E.2d 102, 107 (1967) ("each clause and word must be . . . given effect if possible by any reasonable construction"); *Robbins v. Trading Post*, 253 N.C. 474, 477, 117 S.E.2d 438, 440-41 (1960).

> > The terms of a contract must, if possible, be construed to mean something, rather than nothing at all, and where it is possible to do so by a construction in accordance with the fair intendment of a contract, the tendency of the courts is to give it life, virility, and effect, rather than to nullify or destroy it.

> 17 Am. Jur. 2d *Contracts* § 254, at 648-49 (1964).

*Brown v. Lumbermans Mut. Casualty Co.*, 326 N.C. 387, 392-93, 390 S.E.2d 150, 153 (1990).

The pertinent provisions of the commercial umbrella policy at issue here provide as follows:

### COVERAGE AGREEMENTS

I. COVERAGE. The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of liability

(a) imposed upon the Insured by law, or

(b) assumed under contract or agreement by the Named Insured and/or any officer, director, stockholder, partner or employee of the Named Insured, while acting in his capacity as such,

for damages, direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss" on account of

(1) personal injury, (2) property damage, (3) advertising liability,

caused by or arising out of an occurrence occurring anywhere in the world.

II. LIMIT OF LIABILITY. The company shall only be liable for the ultimate net loss the excess of either

(a) the amount recoverable under the underlying insurances as set out in Item 7 of the Declarations, or

(b) the amount of the retained limit stated in Item 4 of the Declarations in respect of each occurrence not covered by said underlying insurances,

(hereinafter called the "underlying limits"):

and then only up to a further limit as stated in Item 5 of the Declarations in respect of each occurrence—subject to a limit as stated in Item 6 of the Declarations in the aggregate for each annual period during the currency of this policy, commencing from the effective date and arising out of any hazard for which an aggregate limit of liability applies in the underlying policies scheduled or listed herein. In the event of reduction or exhaus-

tion of the aggregate limits of liability under said underlying insurances by reason of payment of claims in respect of occurrences occurring during the period of this policy, this policy, subject to all the terms, conditions and definitions hereof, shall

(1) in the event of reduction pay the excess of the reduced underlying limit;

(2) in the event of exhaustion continue in force as underlying insurance.

. . . .

### DEFINITIONS

THIS POLICY IS SUBJECT TO THE FOLLOWING DEFINITIONS:

. . . .

5. OCCURRENCE. The term "occurrence" means an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence.

. . . .

### CONDITIONS

THIS POLICY IS SUBJECT TO THE FOLLOWING CONDITIONS:

. . . .

J. LOSS PAYABLE. Liability under this policy with respect to any occurrence shall not attach unless and until the Insured, or the Insured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence. The Insured shall make a definite claim for any loss for which the Company may be liable under the policy within 12 months after the Insured shall have paid an amount of ultimate net loss in excess of the underlying limits or after the Insured's liability shall have been fixed and rendered certain either by final judgment against the Insured after actual trial or by written agreement of the Insured,

the claimant, and the Company. If any subsequent payments shall be made by the Insured on account of the same occurrence, additional claims shall be made similarly from time to time. Such losses shall be due and payable within 30 days after they are respectively claimed and proven in conformity with this policy.

We find the policy clear and unambiguous and interpret the policy as written and according to its plain meaning. *Barbee v. Hartford Mutual Insurance Co.*, 330 N.C. 100, 408 S.E.2d 840 (1991); *Fidelity Bankers Life Ins. Co.*, 318 N.C. 378, 348 S.E.2d 794. The policy provisions recited *supra* are <u>identical</u> to the provisions at issue in *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or. 464, 836 P.2d 703 (1992). Plaintiff argues that the phrase "amount recoverable" appearing in the Coverage Agreements means "that amount <u>actually</u> recoverable and collectible from the primary insurer. . . . Because AMLIC is now insolvent, no amount is recoverable from the primary insurer, and Century is required to drop down to provide primary coverage." (Emphasis in original.) Presented with a similar proposed interpretation of the meaning of the phrase "amount recoverable," in *Hoffman Construction Co*. the Supreme Court of Oregon stated:

> Plaintiffs argue that "amount recoverable" means the amount "able to be recovered," *i.e.*, the amount that plaintiffs actually were able to get from their primary insurance carriers.
>
> . . . .
>
> The policy defines "underlying limits" as the "*amount recoverable* under the underlying insurances.*" (Emphasis added.) The difficulty with plaintiffs' theory (*viz.*, that "amount recoverable" means "the amount able to be recovered") is that, under such an interpretation, the portion of the "LIMIT OF LIABILITY" section that specifically identifies the circumstances in which defendant will provide "drop down" coverage would be rendered meaningless. That portion reads:
>
> > "In the event of reduction or exhaustion of the aggregate limits of liability under said underlying *insurances by reason of payment of claims in respect of occurrences occurring during the period of this policy*, this policy, subject to all the terms, conditions and definitions hereof, shall
> >
> > > "(1) in the event of reduction pay the excess of the reduced underlying limit[.]"

(Emphasis added.) Substituting "the amount able to be recovered from the underlying insurances" for "underlying limit," the phrase will read:

> "In the event of reduction . . . of the aggregate limits of liability under said underlying insurances by reason of payment of claims . . . this policy . . . shall
>
> > "(1) . . . pay the excess of the reduced [amount able to be recovered from the underlying insurances.]"

Under plaintiffs' interpretation of "amount recoverable," there was no need for the parties to agree that, if the limit of an underlying policy were reduced, then the defendant would pay the excess of that reduced limit. Defendant *already would have* an obligation to pay the excess of that reduced limit, because that reduced limit would be the amount that plaintiffs were "able to recover" under the underlying policy.

In contrast to that reading of the "drop down" provision of the "LIMIT OF LIABILITY" section, defendant's suggested interpretation gives the provision meaning. Under defendant's interpretation, the "amount recoverable" refers to the amount of the underlying insurances *as they are written*. The "drop down" provision is an exception: the "drop down" provision extends umbrella coverage to those situations in which there is reduced primary insurance due to the fact that the primary is partially or wholly exhausted on account of the payment of claims. That is precisely what that provision says. Defendant's interpretation lets all provisions have meaning; plaintiffs' would not. We assume that parties to an insurance contract do not create meaningless provisions.

*Hoffman Construction Co.*, 313 Or. at 469, 471-72, 836 P.2d at 706-07 (alterations in original). *See Bolton Corp.*, 317 N.C. 623, 347 S.E.2d 369 (presumption that each part of the contract means something); *Williams*, 269 N.C. 235, 152 S.E.2d 102; *Robbins*, 253 N.C. 474, 117 S.E.2d 438. We agree with the *Hoffman Construction Co.* court's reasoning and reject plaintiff-Association's proposed definition of "amount recoverable." Similarly, we reject plaintiff-Association's argument regarding the policy's "Loss Payable" condition. Plaintiff-Association's argument again is grounded largely in its interpretation of the term "amount recoverable." Plaintiff-Association argues:

[T]he Loss Payable condition provides that Century's obligation ripens when the "amount of the underlying limits" shall have been paid. Century ignores the fact that the phrase "underlying limits" is defined in the Limit of Liability coverage clause of the Century policy by referencing the "amount recoverable" language. As discussed above, no amount was recoverable from AMLIC as a result of its insolvency. Therefore, consistent with the Loss Payable condition, Century's obligation attached with the first dollar of coverage.

(Emphasis in original.) (Citation omitted.) We disagree. As *Hoffman Construction Co.* stated:

Under plaintiffs' interpretation of "amount recoverable," that portion of the "Loss Payable" condition would read:

"Liability under this policy with respect to any occurrence shall not attach unless and until the Insured, or the Insured's underlying insurer, shall have paid the amount [able to be recovered on the underlying insurances, if any] on account of such occurrence."

It is clear that the effect of plaintiffs' suggested interpretation of "amount recoverable" is to create a meaningless redundancy under the "Loss Payable" condition, because the underlying insurer *always* will pay the amount that the insured was "able to recover" from the underlying insurer—that is why the insured was able to recover it. It is not reasonable to assume that the parties intended that that portion of the "Loss Payable" condition be meaningless.

*Hoffman Construction Co.*, 313 Or. at 472-73, 836 P.2d at 708 (emphasis in original) (citation omitted). We conclude that the Loss Payable condition serves to reinforce the coverage agreement by making it clear that a loss arising from an occurrence is not payable by defendant-Century unless the limit of the underlying insurance is exhausted by payment, coming either from the insured or from the insured's underlying carrier. *See Radiator Specialty Co. v. First State Ins. Co.*, 651 F.Supp. 439 (W.D.N.C. 1987), *aff'd per curiam*, 836 F.2d 193 (4th Cir. 1987); *Morbark Industries, Inc. v. Western Employees Ins. Co.*, 170 Mich. App. 603, 429 N.W.2d 213 (1988).

The straightforward language of the contract is buttressed by the observation that the fundamental purpose of excess insurance is to protect the insured against excess liability claims, not to insure

against the underlying insurer's insolvency, *Playtex FP, Inc., v. Columbia Cas. Co.*, 622 A.2d 1074, 1078 (Del. Super. 1992), *Morbark Industries, Inc.*, 170 Mich App. at 608, 429 N.W.2d at 216, unless of course the policy expressly provides otherwise. *Alaska Rural Elec. Co-op v. INSCO Ltd.*, 785 P.2d 1193, 1195 (Alaska 1990). *See also Globe Indem. Co. v. Jordan*, 634 A.2d 1279, 1283 (Me. 1993) ("The purpose of an umbrella policy is to protect the insured in the event of catastrophic circumstances when the insurer's liability would exceed the limits of its underlying policy. It is designed to expand the amount, but not the scope of coverage"). *See generally* 8A J. Appleman and J. Appleman, *Insurance Law and Practice*, § 4909.85, p. 452 (1981 & Supp. 1993) (defining excess policies as "policies of insurance sold at comparatively modest cost to pick up where primary coverages end, in order to provide extended protection"); 16 G. Couch, R. Anderson, and M. Rhodes, *Couch On Insurance*, § 62:48 (2d ed. 1983 & Supp. 1993). Our Supreme Court has described the general principles of construction applicable to disputed terms in an insurance policy as follows:

> Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect. If, however, the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder. Whereas, if the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or *impose liabilities on the parties not bargained for and found therein.*

*Woods*, 295 N.C. at 505-06, 246 S.E.2d at 777 (emphasis added). Here, we find no ambiguity as to the term "amount recoverable" or as to the scope of coverage: the primary insurer's insolvency does not constitute an "occurrence" as that term is defined in the policy. We note that the primary insurer was solvent on the date of the loss, here the automobile accident which occurred on 8 June 1985. *See* G.S. 58-48-35(a)("The Association shall: (1) Be obligated to the extent of the covered claims existing prior to the determination of insolvency . . . This obligation includes only the amount of each covered claim

that is in excess of fifty dollars ($50.00) and is less than three hundred thousand dollars ($300,000)").

We find the reasoning of *Hoffman Construction Co.*, 313 Or. 464, 836 P.2d 703, persuasive and we adopt its interpretation of the policy language. Accordingly, we conclude that no ambiguity in the policy exists. We note that our holding is in accord with numerous other jurisdictions. "The financial vicissitudes of the insurance industry in recent years have spawned numerous similar cases . . . . Though there have been some differences in the language of the various insurance contracts construed in such cases, the result in most jurisdictions has been to reject the so-called 'drop-down' theory." *Morbark Industries, Inc.*, 170 Mich. App. at 608-09, 429 N.W.2d at 216 (and cases cited therein). *See also Playtex FP, Inc.*, 622 A.2d at 1082 (and cases cited therein); *Alaska Rural Elec. Co-op*, 785 P.2d at 1195. *See generally*, Annotation, "Primary Insurer's Solvency as Affecting Excess Insurer's Liability," 85 ALR 4th 729 (1991).

Our review of defendant-Century's policy leads us to the conclusion that defendant-Century's coverage does not "drop down" to become primary coverage. We have reviewed plaintiff-Association's remaining arguments, including the argument regarding its payment of defense costs on behalf of the insured in the underlying action, and have found them to be without merit. Therefore, the trial court's entry of summary judgment in favor of defendant-Century on this issue was proper. Accordingly, this assignment of error is overruled.

## II.

[2] Plaintiff-Association next argues that the trial court erred in granting summary judgment for defendant-Century on the counterclaim because "[defendant-]Century cannot, as a matter of law, possess a 'covered claim' against [plaintiff-]Association under the Act." We disagree and affirm.

Plaintiff-Association argues that: 1) defendant-Century is not entitled to any recovery because it does not possess a "covered claim," G.S. 58-48-20(4), under the Act, and 2) "no separate agreement exists between [defendant-]Century and [plaintiff-]Association under which [plaintiff-]Association agreed to reimburse [defendant-] Century if it were determined that [defendant-]Century's policy does not 'drop down.' " In its appellate brief, defendant-Century concedes that it did not "obtain an assignment or other contract from the insured, Long, transferring a right of subrogation against [plaintiff-]

Association." Instead, defendant-Century argues that its right to recovery is based on the doctrine of equitable subrogation.

"Equitable subrogation is 'a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it' and 'arises when one person has been compelled to pay a debt which ought to have been paid by another and for which the other was primarily liable.' " *Harris-Teeter Super Markets v. Watts*, 97 N.C. App. 101, 103, 387 S.E.2d 203, 205 (1990) (*quoting Beam v. Wright*, 224 N.C. 677, 683, 32 S.E.2d 213, 218 (1944)). In the insurance context, our Supreme Court has described the doctrine as follows:

> Generally, the doctrine of equitable subrogation may be invoked if the obligation of another is paid by the plaintiff for the purpose of protecting some real or supposed right or interest of his own. *Boney v. Central Mutual Ins. Co. of Chicago*, 213 N.C. 563, 197 S.E. 122; *Moring v. Privott*, 146 N.C. 558, 60 S.E. 509; *Davison v. Gregory*, 132 N.C. 389, 43 S.E. 916; 22 N.C. L. Rev. 167 (1944). In *Boney*, the Home Insurance Agency took an order for an automobile liability policy from Thomas-Howard Company and confirmed placement with the Central Mutual Insurance Company of Chicago. Later, when Thomas-Howard Company had a liability claim made against it, Central Mutual denied coverage and Home Insurance Agency stepped in and provided a defense. It later turned out that Central Mutual had coverage and on appeal the Court asked this question: "Was claimant such a pure volunteer as to be deprived of the right of subrogation?" In answer, the Court said:
>
> > " 'Cases in our own reports illustrate the doctrine that though the party who makes the payment may, in fact, have no real or valid legal interest to protect, he may yet be subrogated when he acts in good faith, in the belief that he had such interest.' *Publishing Co. v. Barber, supra* [165 N.C. 478, 81 S.E. 694]. . . .
>
> *    *    *
>
> "It is sufficient to invoke the doctrine of subrogation if (1) the obligation of another is paid; (2) 'for the purpose of protecting some real or supposed right or interest of his own.' 60 C.J., Subrogation, Sec. 113."

In the instant case Jamestown defended because Nationwide refused to do so. Jamestown defended in good faith as

Jamestown would have been liable had it been adjudged that Nationwide's policy did not provide coverage for William. Under these circumstances, Jamestown was not such a pure volunteer as to be deprived of the right of subrogation. *Boney v. Central Mutual Ins. Co. of Chicago, supra; Publishing Co. v. Barber*, 165 N.C. 478, 81 S.E. 694.

*Insurance Co. v. Insurance Co.*, 277 N.C. 216, 221-22, 176 S.E.2d 751, 755-56 (1970). As *Publishing Co., Boney*, and *Insurance Co.* illustrate, the determinative factor in assessing whether a party presents a valid claim of equitable subrogation is whether that party (the payor) has acted in good faith in seeking to protect its interests. Here, defendant-Century (the payor) would have been obligated to pay the $100,000.00 had it been contractually required to "drop down," as plaintiff-Association has consistently contended that defendant-Century was required to do. Accordingly, defendant-Century reasonably acted to protect its own interest. We conclude that defendant-Century has acted in good faith: we note that there is no allegation to the contrary. Accordingly, absent a statutory prohibition defendant-Century is entitled to recover the $100,000.00 from plaintiff-Association under the doctrine of equitable subrogation.

[3] Plaintiff-Association argues that defendant-Century is not entitled to recovery from its counterclaim because it neither qualifies as a "claimant" nor possesses a "covered claim" under the Act. According to the Act, its purposes are "to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer . . ." G.S. 58-48-5. The terms "claimant" and "covered claim" are defined under the Act as follows:

(2a) "Claimant" means any insured making a first party claim or any person instituting a liability claim; provided that no person who is an affiliate of the insolvent insurer may be a claimant.

. . . .

(4) "Covered claim" means an unpaid claim, including one of unearned premiums, which is in excess of fifty dollars ($50.00) and arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Article applies . . . "Covered claim" shall not include any amount awarded as punitive or exemplary damages; sought as a return of pre-

mium under any retrospective rating plan; or due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation or contribution recoveries or otherwise.

G.S. 58-48-20. Plaintiff-Association points to the last sentence of 58-48-20(4) and argues that defendant-Century's claim is barred, if not by the term "subrogation" then by the catchall phrase "or otherwise." Defendant-Century contends that a claim based upon equitable subrogation is not barred by the statute:

> An insurer asserting a <u>subrogation</u> claim rightfully paid damages for its insured, in the first instance, under its policy, but contends that another <u>party</u> is primarily liable for the damages. By contrast, an insurer asserting an <u>equitable subrogation</u> claim did not owe the claim, in the first instance; it was owed by another <u>insurer</u> who wrongfully refused to pay the claim. For example, in the conventional subrogation situation, A's automobile collides with B's automobile; A's insurer pays a property damage claim for A under its policy and then pursues recovery against B. If B's insurer were insolvent, A's insurer would have no right to recover against the Association because it would be advancing a "subrogation" claim of an "insurer." That case, however, is not present here. Century's right to recover arises from principles of equity because the Association refused to pay, in full, a first party claim for an insured [of an insolvent insurer, AMLIC]. If the Century policy was not required to drop down [*supra*], then Century had <u>no contractual obligation</u> to pay the first $300,000.00, while the Association had a <u>statutory obligation</u> to do so.

(Emphasis in original.) (Alterations added.)

This Court has stated that while conventional subrogation "arises from an express agreement of the parties," equitable subrogation "rests not on contract but on principles of equity." *NCNB v. Western Surety Co.*, 88 N.C. App. 705, 708, 364 S.E.2d 675, 677 (1988) (*citing Journal Publishing Co. v. Barber*, 165 N.C. 478, 81 S.E. 694 (1914); *Powell v. Wake Water Co.*, 171 N.C. 290, 88 S.E. 426 (1916)). Furthermore, this Court has held that equitable subrogation is a "remedy [which] is <u>highly favored and liberally applied</u>." *Trustees of Garden of Prayer Baptist Church v. Geraldco Builders*, 78 N.C. App. 108, 114, 336 S.E.2d 694, 698 (1985) (emphasis added). We conclude that our General Assembly did not intend for the term "subrogation" to encompass equitable subrogation, particularly in a context in which plaintiff-Association failed to fulfill its statutory obligation, G.S.

58-48-35(a)(1), based upon its misreading of the insurance contract at issue.

We now turn our attention to the phrase "or otherwise" appearing at the end of 58-48-20(4). We interpret the general catchall phrase "or otherwise" by reference to the doctrine of *ejusdem generis*, a well established rule of statutory construction providing that " 'where general words follow a designation of particular subjects or things, the meaning of the general words will ordinarily be presumed to be, and construed as, restricted by the particular designations and as including *only things of the same kind, character and nature* as those specifically enumerated.' " *State v. Lee*, 277 N.C. 242, 244, 176 S.E.2d 772, 774 (1970) (citations omitted) (emphasis added). *See also State v. Craig*, 176 N.C. 740, 744, 97 S.E. 400, 401 (1918) ("when particular and specific words or acts, the subject of a statute, are followed by general words, the latter must as a rule be confined to acts and things of the same kind"). Here, the terms immediately preceding the phrase "or otherwise" in G.S. 58-48-20(4) are "subrogation" and "contribution." These two items are contractual or tort based forms of remedies. *See Squires v. Sorahan*, 252 N.C. 589, 591, 114 S.E.2d 277, 279 (1960) ("subrogation . . . arises by reason of contract, . . . contribution . . . arises by reason of participation in the tort"); *NCNB*, 88 N.C. App. 705, 364 S.E.2d 675. On the other hand, equitable subrogation is a judicially imposed remedy grounded in equity. We conclude that in this context the phrase "or otherwise" does not encompass the purely equitable remedy applicable here.

Finally, our interpretation of G.S. 58-48-20(4), *supra*, addresses a potential inequity alluded to by defendant-Century in its brief:

> In considering the purposes of the Guaranty Act, it is clear that our Legislature intended that insureds, such as Long, would have the full benefit of the statutory cap under the Guaranty Act, $300,000.00, when their insurer becomes insolvent. It could not have intended that the Association could use the statutory reference to "subrogation" as a shield against fulfillment of its statutory obligations. Principles of equity require the Association to reimburse Century for monies owed by the Association as the insurer for Long. This result would effectuate the purposes of the Act by encouraging the Association to promptly settle claims within its statutory limit. It would also prevent the Association from being <u>rewarded</u> for refusing to meet its statutory obligations.

(Emphasis in original.)

We are left with the question: what rational basis led plaintiff-Association to pay $200,000.00, an amount which was $100,000.00 less than its statutory cap under G.S. 58-48-35(a)(1)? Hypothetically, if plaintiff-Association had decided, for whatever reason, to pay only a small fraction of its statutory cap, for example $25,000.00, using plaintiff-Association's flawed interpretation of G.S. 58-48-20, plaintiff-Association would have been under no obligation to pay defendant the remaining $275,000.00. If plaintiff-Association's logic were to prevail, there would be no incentive for plaintiff-Association to fulfill its statutory mandate. The less plaintiff-Association offered to contribute to the settlement of a claim, the more plaintiff-Association would stand to gain since under plaintiff-Association's argument the excess carrier would have no recourse. Plaintiff-Association's proposed interpretation of the statute is inconsistent with the goal of timely proper payments of legitimate claims, G.S. 58-48-5, and could encourage arbitrary and capricious settlement offers, leaving excess insurers with no remedy. We conclude that our General Assembly did not intend to encourage plaintiff-Association to use this type of hard bargaining technique against innocent excess insurers through the Act.

In sum, our decisions have been uniform in distinguishing between conventional subrogation and equitable subrogation. The dictates of *ejusdem generis* lead us to conclude that defendant-Century's recovery based upon equitable subrogation is not barred by G.S. 58-48-20(4). "If and when the lawmaking body wishes to amend the statute, a few words will suffice. This Court must forego the opportunity to amend here." *Insurance Co. v. Bynum*, 267 N.C. 289, 292, 148 S.E.2d 114, 117 (1966). Accordingly, this assignment of error fails.

III.

We hold that defendant-Century's commercial umbrella liability policy is not required to "drop down" and become primary coverage notwithstanding the insolvency of AMLIC. We further hold that defendant-Century is entitled to be paid $100,000.00 in light of plaintiff-Association's $300,000.00 statutory cap, G.S. 58-48-35(a)(1). For the reasons stated, the trial court's 22 April 1993 judgment is affirmed.

NATIONWIDE MUTUAL INS. CO. v. MABE

[115 N.C. App. 193 (1994)]

Affirmed.

Judges MARTIN and McCRODDEN concur.